C. CLINTON *against* S. AND J. STRONG.

*An American ship, with a cargo owned by American citizens, sailed from England to New-York, the 2d December, 1810, before the proclamation of the President of the United States of the 2d November, 1810, was known there, and arrived at New-York, the 18th February, 1811; and was regularly reported to the custom-house. On the 19th February she was seized by the collector of the customs, for a breach of the non-intercourse acts, and libels filed against the ship and cargo, on the 27th February. After the act of congress of the 2d March,*

IN ERROR, on *certiorari*, from the justices' court of the city of *New-York*. *Selah* and *James Strong* brought an action in the court below, against *C. Clinton*, clerk of the district court of the *New-York* district, for money had and received to the use of the plaintiffs, to recover back 31 dollars, with interest. On the trial of the cause, in the court below, on the 14th *November*, 1810, the following facts appeared in evidence.

The plaintiffs were *American* citizens, and sole owners of the ship *Jane Barnes*, an *American* vessel, and of 67 tons of salt, part of her cargo. The ship sailed from *Liverpool*, in *Great Britain*, on the 2d *December*, 1810, bound to *New-York*. At the time of her sailing, the proclamation of the President of the *United States*, dated the 2d *November*, 1810, was not known at *Liverpool*, nor did the captain, officers or crew of the ship, hear or know of it, until their arrival at *New-York*, on the 18th *February*, 1811. On the arrival of the ship, she was regularly reported to the custom-house, by the captain, who exhibited the manifest of the cargo, and paid the customary fees. On the 19th *February*, the ship and cargo were seized by order of the collector of the customs of the port of *New-York*; and on the 27th *February*, a libel was filed against the ship and cargo, in the district court of the *United States*, for the *New-York* district, for a violation of the acts of congress relative to the commercial intercourse. After the act of congress of the 2d *March*, 1811, the seizure of the property was withdrawn, and the vessel and cargo were liberated, as far as the custom-house and its officers were concerned; but they were detained by the *marshal*, who refused to deliver them without an order from the district court, or until the costs of the libels were paid. The owners paid the costs of the attorney of the district, and the fees of the clerk of the court, who refused to give an order for the delivery of the property, until his fees were paid. The owners, afterwards, brought an action for money had and received against the clerk of the district court, to recover back the amount of the fees so paid to him. It was held, that the vessel and cargo were not equitably liable to condemnation; and that the seizure having been withdrawn, the owner was not subject to costs, which are the consequence of some *default*, and are not awarded, at *common law*, or in the *instance* court, against an innocent party.

That the payment of the costs was not a voluntary act, having been exacted by the officer, *colore officii*, as a condition of the redelivery of the property: and that the costs having been illegally exacted, might be recovered back, by an action of *indebitatus assumpsit*, at common law.

Though it belongs exclusively to the court, in which a suit has been originally instituted, to award costs, yet if the suit be discontinued, for want of cause, without any decision of the court, the exaction of costs is an act *in pais*, and the money may be recovered back, by suit against the officer, in any other court of competent jurisdiction.

course between the *United States, Great Britain* and *France,* and their dependencies, called the *non-intercourse acts.*

The plaintiffs below gave in evidence an act of congress, entitled " An act supplementary to an act entitled an act concerning the commercial intercourse between the *United States, Great Britain* and *France* and their dependencies," &c. passed the 2d *March,* 1811; and they proved, by the surveyor of the port, and the deputy collector, that after that act was known in *New-York,* to wit, on the 8th *March,* the seizure of the ship and cargo was withdrawn, and both were liberated, as far as the custom-house and its officers were concerned; and on the same day they were permitted to be regularly entered at the custom-house, and a regular permit granted for landing the cargo.

*William H. Smith,* one of the inspectors of the custom-house, testified, that on the 19th *February,* he took possession of the ship and cargo, by order of the custom-house. That on the 8th *March,* 1811, the plaintiffs presented him the permits for landing the cargo, and demanded the 67 tons of salt, when the marshal of the district, who was then on board, prohibited the landing and delivery of the goods; that from the 19th *February* to the 8th *March,* the witness considered the ship and cargo in his custody, and prior to the 8th *March,* did not see the marshal or his deputy, nor did he suppose, until that time, that the marshal claimed any possession or control of the ship and cargo.

It was proved that on the 12th *March,* the plaintiffs demanded the delivery of the vessel and the salt, of the marshal, who replied, that he could not deliver them up, until certain bills or fees of the officers of the district court, and, among others, the bill of the defendant, which he showed to the plaintiffs, were paid. The bills together amounted to more than 100 dollars.

The plaintiffs then proved the receipt of the defendant, dated the 12th *March,* 1811, for thirty-one dollars, for clerk's fees, or two libels, against the ship and cargo.

The marshal, who was a witness for the defendant, said, that he did not recollect the answer he gave to the plaintiffs, but his general answer to applicants in such cases was, that he would not deliver the property, without an order of the court, or of the clerk of the court, and on such order he should deliver it, without costs. The witness produced the monitions issued on filing the libels, in which the return days were left blank. He did not know when they were

NEWYORK, delivered to him, nor where they were served. No district court
Oct. 1812. was held from the 1st *February* to the 1st *April*, 1811.

CLINTON  *S. B. Romayne*, Esq. acted in behalf of the district attorney,
v.  in *March*, 1811, and testified that the libels were filed by his
STRONG. direction. That after the act of the 2d *March*, 1811, *J. Strong*, one of the plaintiffs, applied to him to have the vessel and cargo given up; but he refused, unless the fees which had accrued, in consequence of filing the libels, were first paid; and he absolutely refused to give any order, until the fees were paid. The attorney, on the 12th *March*, 1811, wrote an order requesting the defendant, the clerk of the court, to give an order for the delivery of the cargo, on payment of the fees. The fees of the district attorney, amounting to 34 dollars, were paid by the plaintiffs, on the same day, and at the same time with the clerk's fees. *Strong* asked the amount of the costs, and being told the amount, complained of the hardship of being compelled to pay it.

The deputy clerk testified, that it was usual to issue monitions with blank return days. The order for the delivery of the goods was delivered to the deputy marshal. That he would not have given the order to any but the marshal or his deputy, nor to either of them, without the payment of the fees, nor without an order from the district attorney. There was no order of the district court to deliver up the vessel and her cargo; but the order was the act of the clerk, when there was no court, or judge present, and was delivered to the marshal, in consequence of the order of the district attorney.

The deputy marshal testified, that on the day he received the monitions, he took possession of the ship and cargo, but put no person on board, though he went daily to visit the vessel, and see that all was safe; and considered them as at the risk of the marshal.

The court below gave judgment for the plaintiffs, for the thirty-one dollars, with the interest and costs.

*Griffin*, for the plaintiff in error, contended, that the action could not be maintained against the defendant. He observed that if there was any *duress* in the case, it was not by the defendant, who, as the clerk of the district court, obeyed the directions of the proper officer. The fees were, in fact, due. A libel had been filed, which was the commencement of a regular suit in the district court.* A monition had also issued, and fees had accrued, be-

* 3 *Johns.* Cas. 145.

fore the act of the 2d of *March*, 1811. The right of the defendant to his fees had become vested before the passing of that act, and could not be devested. The act made no provision for the costs which had accrued. The costs must be paid by some person. It may be said that where a suit is settled, without mentioning the costs, each party must pay his own costs; but this could not be the intention of the act of the 2d of *March*. It conferred a favour on the plaintiffs, by exonerating them from the penalties they had incurred under the previous statutes. The owner accepted the benefit *cum onere*, subject to the payment of costs. It cannot be presumed that the *United States* intended to pay the costs.

It may be said, that these costs were not due; but the district court had exclusive jurisdiction over the subject matter; and its decision as to the costs must be conclusive. Besides, one court never undertakes to decide on the costs accruing in another court; for the fees and costs depend on the usage and practice of the courts.[*] And as the district court acted in this respect as an admiralty court,[†] it would be peculiarly improper for a common law court to interfere as to the costs. Admiralty courts have a peculiar law, and peculiar usages of their own; and it is a common practice for such courts, though they acquit the property, to oblige the owner or claimant to pay the costs, over which they have an absolute discretion.

*3 Bac. Abr. 121. Fees A. Co. Litt. 368. Prec. in Ch. 551. 3 Caines' Rep. 171. 1 Johns. Cas. 515.*

† 4 *Cranch's Rep.* 443.

Again, the payment of the costs was voluntarily made, pending a course of judicial proceedings. In *Irving* v. *Wilson*,[‡] and other cases which may be cited, there was no suit pending: and the doctrine of those cases is greatly weakened by the decision in the case of *Kimber* v. *Hall*.[§] But here was a *lis pendens*, and a court of competent power to give redress, if application had been made for that purpose. Where money is paid in a cause actually pending in a court having jurisdiction, and which, if application is made, has the power to interfere, there, if the money is paid, however illegal or unjust the demand may be, it can never be recovered back. Every person is bound to take care of his own rights, and vindicate them in due season, and in proper order;[‖] and if a party having the means of defence in his power, neglects to use them, he is for ever precluded.[**] The principle is, that where a party has his day in court, and neglects to make his defence, he cannot afterwards resort to an action to recover back the

‡ 4 *Term Rep* 485.

§ 1 *Esp. Ca.* 84.

‖ 1 *Johns. Cas.* 502.

** 4 *Johns. Rep.* 510.

NEWYORK, money he has paid.* In *Mariott* v. *Hampton*,† the decision of
Oct. 1812. Lord *Mansfield*, in *Moses* v. *M'Farlan*, was wholly disregarded,
CLINTON and it was held that where money has been paid by compulsion of
v. a suit, or legal process, it can never be recovered back, though
STRONG. found, afterwards, not to be due. Though it is stated in the re-
* 5 *Esp. Cas* turn that no district court was held from the 1st of *February* to the
277. 2 *Esp.*
*Cas.* 546. 1st of *April*, yet this court are bound to presume, that if proper
† 7 *Term Rep.* application had been made to the judge of that court, he would
269.
have held a court, and given an order on the subject. But even
admitting a delay in that court, that circumstance furnishes no
ground for the interference of this court, nor for an action to recover
back the costs which the party has voluntarily paid.

  *Hoffman*, contra. It is said that the costs were due and claim-
‡ 11th *Cong.* able in this case. This involves the construction of the act.‡ The
sess. 3. c. 96. fi rst section of the act declares, that " no vessel, owned wholly by
a citizen or citizens of the *United States*, which shall have depart-
ed from a *British* port prior to the 2d of *February*, 1811, and no
merchandise, owned wholly by a citizen or citizens of the *United
States*, imported in such vessel, shall be liable to seizure or for-
feiture, on account of any infraction, or presumed infractions of the
act to which this act is a supplement." The terms of the act are
clear and explicit. Neither the *Jane Barns*, nor her cargo, could
be seized, or forfeited. An end was put to all proceedings. The
plaintiffs, or the *United States*, absolutely relinquished all right or
claim. Either the *United States*, or the custom-house officer, at
whose instance the libel was filed, was the plaintiff; and whoever
is to be deemed plaintiff, he abandoned the suit without any reserve
or condition whatever. If a debtor of the *United States* is dischar-
ged by an act of congress, can the marshal detain him until his
fees are paid, or is the debtor obliged to apply to the court of the
*United States* for his discharge ?

§ 5 *Cranch*,   In *Yeaton and others* v. *The United States*,§ a suit attached,
283. and the cause regularly proceeded, and, pending the appeal, the
act of congress expired ; and the supreme court reversed the decree
of the circuit court without costs.

  The reversal restores the party to the same state he was in be-
¶ 7 *Term Rep.* fore. In the case of *St. John's College* v. *Murcott*,¶ a sheriff's
259. officer, being in possession of a tenant's effects, under an outlawry,
made a distress for rent, and sold the goods. The outlawry was

afterwards reversed, and it was held that the officer was liable to refund the money for which the goods were sold. *Ashhurst,* J. said, the instant the outlawry was reversed, the judgment was mere waste paper, and the rights of the parties were restored to the same situation as if no outlawry had taken place.

It is said that the district court has exclusive jurisdiction of this question. But this is an action to recover back money which the defendant has received contrary to conscience and equity. He is liable to refund only what he has so received.* Though the plaintiff may have another remedy, by application to that court, it does not deprive him of his right of action at the common law. It is true the district court might have decided the question summarily, on motion; but the plaintiff has a right to have his cause tried by a jury. But the district court had no jurisdiction of this cause. These parties being both citizens of the same state, could not bring this action in that court. After the passing the act of the 2d of *March,* 1811, on a demand of the property, and a refusal to deliver it up by the marshal, the plaintiff might have brought an action of *trover* for his property, in this court. He was not bound to wait for the decision of the district court. The legislature, the sovereign power of the country, had ordered the property to be restored; and the marshal, on his refusal, became a *tort-feasor.* It is said that this case belongs to the admiralty court, which has peculiar rules about costs. Though a court of admiralty has the power to distribute prize-money among the captors, and pay to each his share; yet, when the prize has been condemned and sold, and converted into money, any one of the captors may bring his action, at common law, for money had and received, against the agent who withholds his share.† And before a condemnation, a captor may assign his share, and the assignee may maintain an action for money had and received against the agent who should, after condemnation, refuse to pay it over.‡

Again, it is said that the money was paid in a regular course of judicial proceedings; but after the act of the 2d of *March,* 1811, there was an end to all judicial proceedings. The property was placed in the same situation as if a seizure had never been made.

The only question is, whether here was a *voluntary* payment. We contend that every officer acting in his office, and receiving fees, *colore officii,* can never, if those fees are illegal, allege that the plaintiff paid them voluntarily.§ If a revenue officer seize

* *Cowp.* 418.

† 4 *East's Rep.* 258. 3 *Bos. & Pull.* 257. 2 *East's Rep.* 220.

‡ 1 *Wils.* 211.

§ *Willes,* 536. 2 *Sid.* 4. *Loft,* 755. 1 *Bos. & Pull* 180.

NEW YORK,
Oct. 1812.

CLINTON
v.
STRONG.

* 4 Term Rep.
485. 553.
Cowp. 69. 805.

goods as forfeited, which are not liable to seizure, and take money of the owner to release them, the latter may bring an action of *indebitatus assumpsit,* for money had and received, to recover it back.*

*T. A. Emmet,* (Attorney-General,) on the same side, was stopped by the court.

*Per Curiam.* The plaintiff in error contends, 1. That costs were claimable from the owners of the property ; 2. That this was, at least, a question for the exclusive cognisance of the district court ; 3. That the payment of the costs was voluntarily made, pending a course of judicial proceeding.

1. As the defendants' vessel sailed from *England,* before notice of the president's proclamation of the 2d *November,* 1810, was or could have been known there, and as she arrived in the *United States,* soon after the 2d of *February,* 1811, she was not, in justice and equity, liable to condemnation for a breach of the non-intercourse law. The seizure was, consequently, withdrawn, and the vessel and cargo liberated, upon notice being received of the act of congress of the 2d *March,* 1811, which exempted such vessels from the operation of the non-intercourse law. To exact costs from the defendants, under such circumstances, would be as oppressive as it would be illegal. The vessel, under the equity of the first law, and by the express terms of the supplementary act, was not liable to seizure or forfeiture, and there was, therefore, no ground to exact costs for the seizure and libel. Costs are the consequence of some *default* of the party against whom they are awarded, and are never, at least in the common law courts, and in the *instance* court, assessed against an innocent party, who is not chargeable with any default.

2. If the costs have been illegally exacted in this case, they are recoverable back by a suit at common law. There is no statute, nor rule, which confines the party who seeks redress for such extortion, to the court in which the suit had been originally instituted. It belongs to a court in which a suit is brought to award costs when they are to be awarded. This is a matter exclusively incident to such court. No other court can do it ; but if the suit be discontinued, as this was, for want of cause, and without being brought before the court for decision, the exaction of costs is an act *in pais,* for which the officer may, indeed, be pu-

nished by that court for his mal-practice, but the money may be recovered back in any other court having competent jurisdiction. The demand becomes a new, distinct cause of action, which is no more cognisable in the district court than any other like cause of action. Whether the seizure of the property was well made or not, was a question belonging exclusively to the district court; but after the suit was discontinued by the parties seizing and prosecuting, on the ground that the seizure was not warranted, the jurisdiction of the court in the case was at an end, and the exaction of costs was a subsequent act of the officer, wholly distinct from the prosecution.

3. The payment of the costs could not be considered a voluntary act. They were exacted by the officer, *colore officii,* as a condition of the redelivery of the property. It would lead to the grossest abuse, to hold a payment made under such circumstances, a voluntary payment, precluding the party from contesting it afterwards.

Judgment affirmed.