Simon, J.
The plaintiffs seek to recover the sum of §4756 40, which they allege, has been illegally claimed and received from them by the defendants, who were inspectors of tobacco, over and above the fees fixed by law, during the period mentioned in the account annexed to their petition, beginning on the 4th of April, 1840, and ending 13th of May, 1842. They state that, being in the habit of receiving large quantities of tobacco, the same was inspected by the defendants; that the fees fixed by law for the inspection, sampling, &c., are sixty cents per hogshead, but that the inspectors have illegally claimed the sum of one dollar per hogshead, refusing to do their duty unless this was paid them ; with which demand they, the plaintiffs, to avoid the delay and injury which would have resulted from resistance thereto, have been necessitated to submit, until the sum so extorted has amounted to that by them claimed, as shown by the detailed account filed with their petition.
The defendants first pleaded the general issue; but they subsequently obtained leave to file a supplemental answer, in which, by way of peremptory exception founded on law, they aver that there is no cause of action alleged in plaintiffs’ petition. They also pleaded the prescription of one year against the plaintiffs’ demand.
The Judge, a quo, was of opinion that the plaintiffs were *524 entitled to recover, and gave a judgment in their favor for the sum of $4636; and the defendants, after a vain attempt to obtain a new trial, took this appeal.
The office of inspectors of tobacco in hogsheads and in casks, was created by an act of the Legislature of the 20th of March, 1816, (Bullard <fc Curry’s Digest, 508,) by which it was provided, that no owner of tobacco should offer the same for sale, until it was inspected in the manner therein directed, under the penalty of $50. The act further provides, that notice should be given to the inspectors that the same might be inspected, and that they should be entitled to recover one dollar for every hogshead or cask ; and by the 4th section it is provided, that each hogshead or cask of tobacco shall be branded by the inspectors thereof “first quality,” “second quality,” or “third quality,” as the case may be;-and any cask of tobacco which shall not be found worthy of being branded, shall be rejected as unmerchantable ; and the casks that shall have been branded as above mentioned shall be sold as bearing the quality thereon described; and when any tobacco shall be rejected as aforesaid, the proprietor thereof shall be at liberty to separate the good from the bad, but if he refuses or neglects to do so within one month of such rejection, the inspector shall, at the cost of the owner, cause the tobacco to be picked and separated and branded, so much thereof as shall be found merchantable; and the inspectors shall cause the tobacco which shall be judged by them unfit to pass, to be burnt.
By the.second section of an act of 1818, supplementary to the act of 1816, it is made the duty of each and every inspector of tobacco, when a hogshead or cask is opened for inspection, to examine the same, carefully, in at least three different places, before pronouncing on the quality of the same, and in no case shall the brand be affixed until at least two inspectors have agreed on the quality thereof; and for each and every hogshead or cask thus examined, the inspectors inspecting the same, shall be authorized to demand and receive fifty cents and no more; and it shall further be the duty of the inspectors to cause the hogsheads or casks to' be well closed and coopered, so as to render the same perfectly secure and safe, for which they may demand and receive 75 cents in addition to the price of inspection.
*525 By the first section of the law of 1819 (B. & C.’s Digest, 510,) amending the two previous acts, it is provided: “ that it shall henceforth be the duty of each and every inspector of tobacco, when a hogshead or cask is opened for inspection, to examine the same carefully in at least three different places, before pronouncing on the quality of the same ; and in no case shall the brand or mark be affixed until at least two inspectors, one of whom shall always be taken among the last appointed, have agree on the quality of the tobacco, which quality shall be mentioned in a certificate signed and delivered by the said inspectors, and for each and every hogshead and cask thus examined, the inspectors inspecting the same, shall be allowed to demand and receive sixty cents, and no more.
It results, therefore, from the different provisions contained in the above three legislative acts, that the duties of the tobacco inspectors consist: 1. in examining the tobacco carefully in at least three different, places, after the hogshead or cask is opened for inspection ; 2d, in at least two of them pronouncing upon the quality thereof,'and agreeing upon such quality before affixing the brand on the hogsheads or casks inspected; 3d, in branding the casks “ first quality,” “ second quality,” or “ third quality,” as the case may be, unless found unmerchantable, in which last case, the tobacco is to be by them rejected as such ; and 4th, in giving a certificate, in which the quality of the tobacco so inspected is to be mentioned. For all which services they are entitled to demand and receive sixty cents and no more, for each and every hogshead or cask thus examined. In case further services are rendered, to wit, for causing the rejected tobacco to be picked and separated and branded, so much thereof as shall be found merchantable, and the unfit part thereof to be burnt, they are to be at the cost of the owners ; and for causing the hogsheads or casks to be well closed and coopered, so as to render them perfectly secure and safe, they are entitled to demand and receive seventy-five cents per hogshead, in addition to the sixty cents allowed by law as the price of inspection.
The evidence shows, that on the 14th of March, 1836, the defendants, who were then inspectors of tobacco, and who, until lately, have continued to act as such, published a certain notice *526 addressed to dealers in tobacco, proposing to furnish in future certificates of inspection agreeable to law, as also to furnish, ex officio, samples to those who may desire them, at a charge of 40 cents each ; further specifying in said notice, that where samples are furnished, the label thereof will exhibit any objections to the hogshead of tobacco which the inspector may have, such as additional tare of the cask, rates of damages, condition, or extraordinary dimensions, as the case may be. On the 21st of the same month, certain resolutions adopted by a large meeting of the dealers in tobacco were published in the Bulletin newspaper, apprising the public that for certain reasons therein specified, said dealers in tobacco had, in addition to the duties imposed by law on the inspectors, determined that they should, ex officio, render such further services in the execution of their said duties, as are specified in the said resolutions, (in substance the same as are proposed in the first notice,) for which they should receive forty cents per cask, half to be paid by the seller, and the other half by the buyer. On the 15th of the same month, a letter was addressed to the inspectors by a committee appointed by a meeting of the receivers of tobacco held the day before, complaining of the extra-charge for sampling, and transmitting to them the opinion of the then Attorney General of the State, adverse to the inspectors’ pretensions. This letter was answered on the same day by the inspectors, informing the committee that they would be at all times ready and willing to inspect all tobacco in the manner (therein specified,) provided for by the inspection laws, for which they would expect a compensation of sixty cents per hogshead; and that as individuals, unconnected with their official duties, if requested, they would draw samples, &c., for which they should expect as compensation for such services, forty cents for each hogshead.
It further appears from the testimony of several witnesses examined on the trial by plaintiffs, that previous to 1836, the inspectors furnished the samples without any additional charge; that in 1836, the buyers complained of the loss they' sustained in the tare, &c., and it was agreed, on both sides, that the inspectors should receive 40 cents additional compensation for sampling, labelling, &c. By the adoption of these regulations, *527 the tobacco trade has been put on a better footing than it ever was before; it has better secured the interest of the buyer and seller, and facilitated the operations of the trade. These regulations, agreed on at that time, have constituted the usage and mode of trade until now, and the defendants, since 1836, have performed the duties enjoined upon them by the meeting. Since then, the factor has been in the habit of charging the planter with the whole charge, but on effecting the sale, debiting the buyer with one-half. The forty cents have been paid without complaint on the part of any one; and it is generally understood, that it is altogether by the samples that tobacco is bought and sold.
It is also shown by the testimony of witnesses examined by the defendants, that it was agreed that the charge of forty cents should be paid, in order that the certificate should express the tare of the tobacco, and its defects and qualities. Previous to 1836, this was not done, and the damaged tobacco has been classed since that time. At the time of the meeting there was a good deal of necessity for it, because the inspectors would not give any samples at all. ■ The payment of forty cents has tended to better the trade, and has given confidence to the certificates of the samples. No one ever complained of the charge, nor were any persons ever vexed or harrassed by the inspectors. The commission merchants, buyers and planters have been benefitted by the imposition of the charge of forty cents. The witnesses consider it a kind of compromise between the factor, seller, purchaser and inspector, that the charge should be made; the general opinion in 1836, being, that there was nothing in the law to protect the dealers, the charge was allowed as extra-official. The witnesses all agree, that the regulations of 1836 have, tended to make the tobacco stand higher than it previously did, arid have been carried out with good faith. They consider the compensation of forty cents as reasonable, and one of them says that, as a buyer, he always paid his half very cheerfully. They think the proceedings of the meeting of 1836 have met the concurrence and approbation of factors, planters, and others in the trade.
It is evident from the facts above established, that although *528 there is no positive proof of the resolutions of the meeting having ever come to the knowledge of the plaintiffs, and of the latter having ever given their express concurrence thereto, they submitted for a long space of time to the charge of forty cents, to which they now give the epithet of extortion,, without urging any complaint against it. An immense quantity of tobacco was inspected, at their request, as factors ; and there is no proof that, as they allege, they were necessitated to submit to the charge, to avoid the delay and injury which would have resulted from resistance thereto, or that the inspectors ever refused to do their duty unless said charge was paid. On the contrary, we find in the letter of the inspectors to the committee, which letter was produced in evidence by the plaititiffs, that the inspectors proposed to make, two distinct charges, viz.: one of 60 cents per cask for the inspection of tobacco in the manner provided for by law, and another of forty cents per hogshead for the extra services to be by them rendered as individuals, for sampling, labelling, &c. if requested. Now, it is also shown by the testimony of William Gray, that he has sent a good deal of tobacco of his own and of others to the plaintiffs, since 1836, and that in the account of sales rendered to him, the plaintiffs have charged him with the fees of inspection and sampling. Witness has never requested them to sue for and recover back the fees, and they never told him that they intended refunding him the twenty cents. Does not this fact show that the plaintiffs, in their dealings with the inspectors, always considered the charge as a fair one, and that it was at least a just remuneration for the services by them rendered extra-officially 1 They have not established a single instance of any objection on their part to pay the charge; on the contrary, their books show that the planters and purchasers were regularly debited according to the regulations; and the receipts of the inspectors also show, that the forty cents complained of were uniformly paid as an extra-charge, distinct from the charge made under the inspection laws.
This action is based upon art. 2279 of the Civil Code, which declares that, “ he who receives what is not due to him, whether he receives it through error or knowingly, obliges himself to restore it to him from whom he has unduly received itand upon *529 art. 2280 which provides, that “ he who has paid through mistake, believing himself to be a debtor, may reclaim what he has paid.” But by the terms of art. 2281, and of art. 18 of the Code of Practice, it is provided, that “he who pays through error what he does not owe, has an action for the repetition of what he has thus paid, unless there was a natural obligation to make such payment; but it must be proved that he paid through error, otherwise it shall be presumed that he intended to give.” Thus, it is clear, that in order to sustain an action of this kind it is necessary to show, not only that the sum paid was not due, but that it was so paid through error; and yet if the payment was thus made as the consequence of a natural obligation, no recovery can be had. Toullier, 11, No. 87, says: “ La repetir tion doit done cesser dans tous les cas oú il existe una cause de payement raisonable et vraisemblable, quand méme la chose payee ne seroit pas due dans le sens légal et rigoureux du mot, suivant lequel une chose n’est due que lorsqu’on a une action civile pour Véxiger“ Debitor intelligitur is a quo invito exigí pecunia potest.” L. 108, V. S. 6 Toullier, 386. Pothier, Oblig. No. 195. See also Pandectes Francaises 10, p. 377, on art. 1376 of the Nap. Code, corresponding with our art. 2278, in which the commentator says : “ Pour qu’il y ait lieu a la repetition, il faut que celui qui a payé ignore qu’il ne doit point, car celui qui paye sciemment ce qu’il ne doit pas, ne peut pas répéter, quand méme en payant il auroit eu Vintention de réclamer ensuite.” This doctrine is founded upon the Roman laws. L. 1., § 1 De Condictione Indebiti. “ iSed si sciens se non debere solvit, cessat repetitio and L. 50 De Solutionibus.
It cannot be controverted, that it is unlawful for a man to contract for or receive usurious or compound interest; but yet if it be paid, the law gives no action to recover it back. 2 La. 428. It is a compliance with a natural obligation which, under the definition given in art. 1750 of the Civil Code, “ is one which cannot be enforced by an action, but which is binding on the party who makes it, in conscience, and according to natural justice.” A natural obligation is also one which the law renders invalid for the want of certain forms, or for some reason of general policy, but which is not in itself immoral or unjust. Civ. *530 Code, art. 1751. And no suit will lie to recover back what has been paid or given in compliance with a natural obligation. Ibid., art. 1752.
Now, for a proper application of the legal principles above recognized, let us put the case in the position most favorable, under the evidence, to the plaintiffs’ pretensions; and let us suppose, although we are not prepared to express any opinion on this point, that it was unlawful for the defendants to receive the extra-compensation complained of, and that, therefore, in the words of the law, they have received what they were not entitled to, and two questions will present themselves :
1st. Did the plaintiffs pay the amount sued for through error?
2d. Were they not bound under a moral or natural obligation, to compensate the defendants for their extra-services?
I. We have already demonstrated, that the plaintiffs well knew the extent of the services which, under the inspection laws, they had a right to require of the defendants, as also the limit of the charge, which, under those laws, the defendants were entitled to make as a compensation for such services. When they employed the defendants to sample and label the tobacco, and to fulfil the other duties imposed by the regulations of 1836, the plaintiffs were aware that these were not included among those pointed out by the inspection laws, and that the extra-charge, which they consented to pay, was beyond the limit of the fees allowed by said laws. They submitted to this charge for a certain number of years without complaint, and have always regularly charged it on their books to the account of the owners and buyers, for whom and with whom this kind of business was by them transacted ; nay, we must believe that they have been uniformly reimbursed, and that they never paid any thing out of their own money. Can they now say that they paid through error ? Can they pretend that they paid with the idea and under the belief, that the charge was warranted by law, or, in other words, that the services were rendered and the charge made according to law 7 Certainly not. They were at liberty to require and use the inspectors’ services in the manner pointed out by law. This they have never thought proper to do ; and it is obvious that when they called upon the defendants to extend their services *531 beyond those specified in the law, they did so knowingly, and that they must necessarily have known that the charge to be made was also beyond that allowed by law. Again, in the words of the Roman law : Si sciens se non debere solvit, cessat repetitio.
II. It seems to us, under all the circumstances of the case, that it is manifest that this is an attempt to deprive the defendants of the value of services by them rendered, from which, it must be acknowledged, the plaintiffs have been greatly benefitted. It may be true that, from the terms of the inspection laws, the inspectors were entitled to demand and receive sixty cents, and no more, and that whatever be the extent and importance of their extra-services as inspectors, they could not demand any compensation beyond the amount fixed by law. But, on the other hand, is it not equally true that they were not bound, as inspectors, to furnish their services beyond the specifications of the law ? Are not their duties well defined and pointed out, in the several acts of the Legislature on this subject ? And do those laws contain any provisions by which the inspectors could be compelled to sample and label the tobacco, and to fulfil any of the duties imposed upon them by the regulations adopted by the meeting of the tobacco dealers in 1836, for which they were to be allowed an extra-reward of 40 cents? Surely not. As we have already remarked, it is not shown that the plaintiffs ever made any objection to the defendants inspecting their tobacco in the manner pointed out by the regulations ; this, on the contrary, has been the uniform course pursued in all their dealings with the inspectors, and we are convinced, under the evidence, that that course has had the effect of better securing the interest of the dealers, and of facilitating the operations of the trade. The plaintiffs were factors of tobacco, and they and those for. whom they acted, had a very extensive interest in this branch of our trade. Thus, it is clear, that the services' rendered by the defendants were greatly beneficial to the plaintiffs; and if so, as equity forbids that they should profit by the labor of others without a fair remuneration, we are of opinion that the prohibition to demand more than sixty cents, being merely founded upon motives of public policy, and not upon any degree of immorality, and being *532 simply malum prohibitum and not malum in se, the plaintiffs, by paying to the defendants an extra-charge of forty cents per hogshead of tobacco for their-extra-services, have complied with an obligation which they were bound to discharge in foro conscientico. It was on their part, a natural obligation.
Under this view of the case, we think it unnecessary to examine the question raised by the pleadings, in relation to the plaintiffs’ right of action, and the plea of prescription.
It is, therefore, ordered and decreed, that the judgment of the District Court be annulled and reversed; and that ours be in favor of the defendants, with costs in both courts.*

 G. Strawbridge, for a re-hearing. The court err in stating this to be an action to recover money paid in error. No such question was raised by the pleadings or argument. The petition alleges, “ that defendants illegally claimed the amount received by them, refusing to do their duty unless it was paid, and that plaintiffs, to avoid the delay and injury which would have resulted therefrom, did pay, &c.” The charge is, that the money was extorted under color of defendants’ office. The principles quoted from the Code and the Pandects are applicable to the rights of individuals in their private dealings — not to the rights and duties of public officers. Taxes improperly assessed may be recovered back, even where voluntarily paid. 17 Mass. 461. 4 Pick. 365. 19 Ib. 17. So where a collector refuses a clearance until tonnage or light money is paid (9 Johns. 201); or where a clerk refuses to issue an order for the release of a vessel under seizure, until his fees are paid. 9 Johns. 370. See also Cantzler v. Gordon, 6 La. 258. So in all cases where money is obtained by extortion or oppression, or by taking undue advantage of a party’s situation, an action will lie to recover it back. 1 Wend. 360. 13 Serg. & Rawle, 258.
But it is stated in the opinion of the court, that the payment was voluntary — that the services were extra — that the public has been better served — and that there was a moral and natural obligation to pay. It is denied that the payment was voluntary. The services for which the additional compensation was charged were such only as had been performed, under the same laws by all previous inspectors, and by the defendants themselves, from their appointment, until 1836. Such is shown to be the usage in other cities. The contemporaneous construction of the law, and the usage grown up with the business in this city show, that such services are a part of the duty of inspection. See the section of the Code which treats “ of the obligation to perform, as incidents to a contract, all that is required by equity, usage, or law.” Again ; much stress is laid on the fact, that the public has been better served since the extra-allowance has been paid. But surely it is not pretended that, where a charge is not authorized by law, an officer may exact it provided he be more attentive to his duties. That there was not a natural, but a legal obligation to pay the fees established by law is plain ; it is equally clear that there was no obligation, *533 legal or natural, to pay such charges as the law never authorized. Jt is not true that all the tobacco on which the extra charge has been paid was received by plaintiffs as factors. Such was the case as to Gray’s, and as to the tobacco owned by him the action was discontinued.
lie-hearing refused.