*W. R. Pierse* and *H. D. Thompson,* for appellants.

*J. W. Sansberry,* for appellee.

---

The Lafayette and Indianapolis Railroad Company et al. *v.* Pattison.

Money Paid Under Mistake of Law.—*Voluntary Payment. — Controling Necessity.—Duress.*—It is well settled by the current of authority, that where money is paid with a full knowledge of all the facts and circumstances upon which it is demanded, or with the means of such knowledge, it cannot be recovered back upon the ground that the party supposed he was bound in law to pay it, when in truth he was not. Nor can money voluntarily paid upon demand, though the demand be unjust, be recovered back where the party paying has full knowledge of all the facts. But if there be a controlling necessity in the case, arising from the peculiar circumstances under which the money is demanded, the rule does not apply. This controlling necessity may arise from duress as applied to the property, as well as to the person, and where one person is in possession of the goods or property of another, and refuses to deliver the same up to that other, unless the latter pays him a sum of money which he has no right to receive, and the latter, in order to obtain possession of his property, pays that sum, the money so paid is a payment by

The Lafayette and Indianapolis Railroad Company *et al. v.* Pattison.

compulsion, and may be recovered back. So, if the property be not actually in the possession of a person, but he has such control over it as to give him an undue advantage over another, and money is therefore paid to remove such control, or if thereupon it is agreed between the parties that if the money is so paid, it shall not be regarded as a voluntary payment and may be recovered back if the party paying is otherwise entitled to recover, such recovery may be had.

CONTRACT.—*Shipment of Cattle.—Freight in Excess of Contract Paid Under Protest.—Recovery of Excess.*—During the rebellion, A. had a contract to furnish the government with a certain number of beef cattle during two months, and for the purpose of filling such contract went to Chicago and made a contract with a railroad company to ship cattle for him to Indianapolis at sixty-five dollars per car; and leaving an agent to ship, he returned to Indianapolis to receive the cattle. The cattle of the first shipment of two car loads were sent to the cattle yard of A., and after a few days a bill for two hundred and one dollars and two cents was sent to A., which he refused to pay, and informed the agent of the railroad company that he had a contract for the shipment at sixty-five dollars per car; the agent denied knowledge of any such contract, and insisted that the bills must be paid as presented, and that he would not deliver any future car loads of cattle until the freight was paid, as he made it up from the way-bills, and that the bill included other things besides freight, which he could not itemize. It was agreed that A. should pay under protest, and also future freight, and the cattle should be delivered as they arrived, and A. should reserve the right to recover any sum so paid unjustly. In pursuance of this agreement, the agent delivered the cattle at the yard of A. as they arrived from time to time, and as soon as the bills were prepared they were paid by A.

*Held*, that the payments were not voluntary, and that A. could recover all sums so paid in excess of his contract price.

APPEAL from the Marion Circuit Court.

BUSKIRK, J.—This was an action by the appellee against the appellants to recover alleged overcharges for freight paid by him to the appellants on cattle shipped from Chicago, Illinois, to Indianapolis, Indiana.

The complaint was in two paragraphs. The first paragraph alleged that the defendants were indebted to the plaintiff in the sum of two thousand dollars for money had and received by the defendants for the use of the plaintiff, which remained due and unpaid.

The second paragraph of the complaint alleged, in substance, that the defendants owned, controlled, and operated different railroads extending from different points, but con-

stituting one continuous line between Chicago and Indianapolis, and were engaged in shipping freights, cattle, etc., between the said cities at established rates of freight; that the customary rates for shipping cattle on and over said roads, and between said cities, was fifty dollars per car; that defendants undertook and agreed to ship over said roads, between said cities, a large number of car loads of cattle for the plaintiff at customary rates of charges; that plaintiff delivered to defendants at Chicago twenty-one car loads of cattle, to be shipped over said roads to Indianapolis, at customary rates, and defendants transported said twenty-one car loads from Chicago to Indianapolis, but instead of charging plaintiff customary rates, they extorted from him one hundred and twelve dollars per car load, and refused to deliver such cattle to the plaintiff at Indianapolis unless he would pay such unreasonable and extortionate charges; that thereupon the plaintiff offered to pay reasonable and customary charges, and demanded his cattle, which the defendant refused; that said cattle were dying in the cars, and the plaintiff was compelled to and did pay such extorted and immoderate rates, in order to save the lives of his cattle and prevent great damage to himself; that he paid said extorted and improper charges under protest, and with the understanding that should said sum be found to be over the customary rates for shipping such stock over said roads, he reserved the right to recover the amount so extorted from him; that the plaintiff paid the defendants, in the manner aforesaid, for shipping said twenty-one (21) car loads of cattle, the enormous sum of two thousand three hundred and sixty-five dollars and ninety cents ($2,365.90), which he avers was one thousand three hundred and fifteen dollars and ninety cents more than the usual and customary rates for shipping stock over the said roads between the said cities; and that the defendant thereby wrongfully, unjustly, and without right extorted from him said sum of one thousand three hundred and fifteen dollars and ninety cents, which sum is justly due

NOVEMBER TERM, 1872.  315

The Lafayette and Indianapolis Railroad Company *et al. v.* Pattison.

from said defendants to the said plaintiff, and which they refuse to pay, although often requested so to do.

The defendants demurred separately to each paragraph of the complaint; but the demurrer was overruled, and the defendants excepted, and this ruling is assigned for error.

The learned counsel for appellants have been unable to point out any valid objection to the complaint; and not having discovered any, we conclude that the complaint was good, and that the action of the court in overruling the demurrer thereto was eminently proper.

The defendants answered by the general denial. The cause was submitted to a jury for trial, and resulted in a finding for the plaintiff in the sum of nine hundred dollars. The court overruled the defendants' motion for a new trial, and rendered final judgment on the verdict, to which rulings proper exceptions were taken.

The appellants have assigned for error eleven causes. The first and eleventh are valid. The first is for overruling the motion for a new trial. The eleventh is for overruling the demurrer to the complaint, which has been disposed of. The other nine are the reasons assigned for a new trial and are covered by the first assignment.

It is contended by the appellants that the court erred in overruling the motion for a new trial, for the following reasons:

First. Because the payments made by the plaintiff were voluntary, and cannot be recovered back.

Second. That the damages assessed were excessive.

Third. That the court erred in giving instructions to the jury numbered 1, 2, 4, and —.

Fourth. That the court erred in suppressing the 1st, 2d, and 3d questions of the cross examination by plaintiff in the deposition of Thomas Hoop.

Fifth. That the court erred in sustaining the motion of plaintiff to suppress the re-direct interrogatory by defendants to Homer E. Sargent, and his answer thereto in the deposition of said Sargent.

Sixth. Because the verdict is not sustained by the evidence.

The first question which we are required to examine and determine is, whether the payments made by the plaintiff were voluntary; and a clear comprehension of the question cannot be had without setting out that portion of the testimony which relates to such payments.

The plaintiff testified that he had a contract with the government to furnish cattle for two months; that he went to Chicago and made a contract with the railroad company to ship cattle from that city to the city of Indianapolis, at the rate of sixty-five dollars per car load, and that he left an agent in Chicago to purchase and ship cattle, and that he returned to Indianapolis to receive such cattle. He then testified as follows:

"First shipped two car loads, which were delivered to me at my yards, under arrangements previously existing as to all stock shipped to me in the pork business, with Mr. Parmelee, agent of the L. & I. R. R., and one of the defendants; a day or two after this, the bill of freight, dated February 11th, 1865, for two hundred and one dollars and two cents, was presented to me by a drayman; I thought it too large, and told him I would see Mr. Parmelee; I called to see him, and told him my understanding of the arrangement, and that I would not pay it; he said it put him in an awkward place, as he had delivered the cattle to me, and his instructions were not to deliver until after freights were paid; I told him I was to receive other cattle; he said I must pay the bills for them, or he could not deliver cattle; I had him telegraph in relation to the bill; the answer was that there were other charges; Parmelee said he could give no items other than as appeared from the way-bill; he told me that he could not deliver cattle yet to be shipped to me, unless I paid the bills as they came in; he said he would have to unload the cattle in the railroad yards, unless I paid the bills. I had to have the cattle to fill a government contract, and I agreed to pay the bills for future shipments as they came

in, reserving the right of having errors or overcharges corrected; my contract with the government was to run for two months, and I had to have the cattle, and I agreed to pay the bills as presented for future shipments, reserving the right to have corrected errors and overcharges, and he agreed to send the cattle, as they came, direct to my yards."

Then follows a tabular statement of the sums which he had paid for freight on cattle, amounting in the aggregate to two thousand three hundred and sixty-five dollars and ninety cents.

The plaintiff then testified as follows: "The payments were made at different times; part, for cattle already received, was paid before all the cattle arrived; there had been but the one shipment before this arrangement; the first shipment had been delivered to me before the first bill was presented, and before the conversation above stated; part of the first shipment had been killed by me when this occurred, and part were still in my yards not killed. My recollection is that I paid the first bill at the date of our conversation at Parmelee's office; afterward I made payment as he sent in the bills; the February shipments were paid before March; the bills per car increased from about one hundred dollars to one hundred and forty dollars; I talked to Mr. Parmelee about this increase, but he could not account for it; he told me that he would make inquiries, and afterward told me that he could not find out much about it; said there were, might be, some charges for feed and hands for loading; he gave this as an explanation of the amount of the charges; I had no knowledge of any charges aside from freight, except what Parmelee told me; think he gave me one item of fourteen dollars, feed on one shipment, but aside from that, was not more specific than I have stated; I afterward talked to Parmelee about refunding; told him there was a great mistake, and I wanted it rectified; he said it was right that it should be rectified; that the bill was larger than they had ever collected before; I wrote to Lafayette and Chicago to

have it corrected, but they refused; they have never furnished me any statement of items, other than the bills."

The plaintiff, on cross examination, testified as follows:

"These bills now in court are the ones I paid. They may embrace loading, bedding cars; don't know now, nor did I prior to the payment of them, whether they embraced anything other than freight or not; Parmelee demanded payment of the bills as they are, and I paid them under protest; he made no other demand than is shown by bills; my son went up prior to February 25th; my son went up prior to that; think he came down with the cattle on the 23d of February; all the shipments were a good while on the road; I think I made out a statement of these overcharges and sent to Chicago; Parmelee told me he had no power to do anything in the matter."

Here follows a statement of contract in reference to the shipment of the cattle. The witness then proceeds as follows: "I did not pay the freight on any cattle before they were delivered to me; all freights I paid were on cattle that had already been delivered to me; no shipments paid until I had received the same; Parmelee told me, after the first shipment was received, he would deliver no cattle until freights were paid; I told him to send the cattle to my yard as they were brought in by the trains, and I would pay the bills, whatever they might be, reserving the right to have errors corrected; the next shipment was shortly after this agreement was made; after the conversation of Parmelee and myself, as shipments arrived the cars were sent to my yards and the cattle were delivered to me, and I paid the bills as presented, after the cattle had come to my possession."

Mr. Parmelee testified as follows: "In February and March, of 1865, I was local freight agent of the L. & I. R. R.; the cattle were received and delivered to Pattison; the freight bills were made up from the way-bills, and are as follows:" Here follow the way-bills. The witness then proceeded, as follows: "The charges advanced are not itemized in the way-bill, but in gross; there are, or may be, both

freight and other charges in the way-bills; I made out the receipted bills from the way-bills, but they are in the aggregate; Pattison inquired of me about the items; I told him I could not give the items; I told him I had no authority to collect other than according to the bills; when I made inquiry as to this first shipment, I was informed there were other charges aside from freight; Pattison claimed his contract was sixty-five dollars per car; the usual rate then was sixty dollars per car from here to Chicago; don't know the rate from Chicago here; after the first shipment came and had been delivered, I sent the bill around to Mr. Pattison for collection; he sent me word he would call and see me; he came, and claimed he had a contract for sixty-five dollars per car, and we agreed that for future shipments he would pay, under protest, whatever the charges might be, and I was to send the cars around to his yards, I telling him that if there were any overcharges they could be rectified as well after as before payment; the local rate per car from Lafayette here was twenty-five dollars; local rates are higher than through rates; on all of these way-bills, the one of date March 20th, contains an item of fourteen dollars for feed; Pattison and I had several conversations about this matter; he paid all of his bills under protest; he, on the first shipment, refused to pay, and then we agreed that I should send around the cars and he should pay the bills; my object was to get the freight, and his to get his cattle."

This witness, on cross examination, testified as follows:

"I did not, at any time, collect freight before the cattle, for transportation of which freight was charged, were delivered; cattle were all delivered first; I claimed payment of him just according to way-bill; I knew of no charges but as shown by the way-bill, and I know of no other now; all I know of items is what the way-bill shows; I know I showed Pattison the way-bill for the first shipment, and some others; I think I showed him all, but I am not positive that I showed him every one; on a rate of sixty-five dollars, M. & C. would get sixteen dollars and ninety cents,

L., N. A. twenty-eight dollars and sixty cents, and L. & I. nineteen dollars and fifty cents; distance from here to Lafayette, sixty-four miles; from Lafayette to Michigan City, ninety-two miles; from Michigan City to Chicago, fifty-six miles; on these way-bills no through rates are designated; when the amount due to the L. & I. road is specified on the way-bill, it indicates a contract; some of the cars are larger than others; when cars start from Chicago, charges made up from there, but they are re-way-billed at Michigan City and Lafayette, the proportion of each road being specified; if contract, at contract price; if no contract, then at the local rate of each road; when there is a contract, that is designated by the proportion each road is entitled to."

There was much testimony in reference to whether there was a special contract for shipping the cattle, and what was the usual rate of freight. The evidence above set out was all there was in reference to the delivery of the cattle to Pattison, and the payment by him of the freight.

It is earnestly claimed by the appellant that it is conclusively shown by the evidence that the payments made by the appellee were voluntary, and cannot be recovered back. On the other hand, it is maintained that the payments were compulsory, and can be recovered back.

The antagonistic position of counsel renders it necessary that we should determine what payments are voluntary and what are compulsory.

There is no conflict, in the authorities, upon the proposition that money voluntarily paid cannot be recovered back, and that money paid under compulsion may be recovered back; but there is considerable conflict among elementary writers and in the adjudged cases as to what are voluntary and what are compulsory payments.

It is settled that where a person is compelled, by duress of his person, to pay money, and he pays the same under protest, such payment is compulsory, and can be recovered back. By duress, in its more extended sense, is meant that degree of severity, either threatened or impending, or ac-

The Lafayette and Indianapolis Railroad Company *et al. v.* Pattison.

tually inflicted, which is sufficient to overcome the mind and will of a person of ordinary firmness. The common law has divided it into two classes, namely, duress *per minas*, and duress of imprisonment. Sec. 301, 2 Greenl. Ev.; *Fellows* v. *School District No.* 8, *in Fayette*, 39 Maine, 559; *Brooks* v. *Berryhill*, 20 Ind. 97; *Foshay* v. *Ferguson*, 5 Hill N. Y. 154; *Ex parte William Wells*, 18 How. U. S. 307; *Inhabitants of Whitefield* v. *Longfellow*, 13 Maine, 146; 2 Lord Coke's Institutes, 483; Co. Lit. 253; Vin. Abr. tit. Duress, (B.) pl. 23; Com. Dig. Pleader, (2 W. 20); Bac. Abr. tit. Duress (A); Chitty Contracts, 168; *Eddy* v. *Herrin*, 17 Maine, 338.

The weight of modern authority is, that a deed may be avoided which was obtained by duress, although the imprisonment was under legal process. In *Watkins* v. *Baird*, 6 Mass. 506, PARSONS, C. J., said: "It is a sound and correct principle of law, when a man shall falsely, maliciously, and without probable cause, sue out a process in form regular and legal, to arrest and imprison another, and shall obtain a deed from a party thus arrested to procure his deliverance, such deed may be avoided by duress of imprisonment. For such imprisonment is tortious and unlawful as to the party procuring it; and he is answerable in damages for the tort, in an action for a false and malicious prosecution; the suing of legal process being an abuse of the law, and a proceeding to cover the fraud."

Another class of cases is, where the payment of money is made upon an illegal demand by one who has authority to levy upon the property of the person upon whom such demand is made, and by a sale of such property to satisfy and discharge such claim; and where payment is made upon such a demand and to prevent such seizure and sale of property, the payment is also compulsory. *Boston and Sandwich Glass Co.* v. *City of Boston*, 4 Metcalf, 181; *Amesbury Woollen and Cotton Manufacturing Co.* v. *The Inhabitants of Amesbury*, 17 Mass. 461; *Preston* v. *The City of Boston*, 12 Pick. 7.

It is well settled by the current and weight of authority

that where money is paid with a full knowledge of all the facts and circumstances upon which it is demanded, or with the means of such knowledge, it cannot be recovered back upon the ground that the party supposed he was bound in law to pay it, when, in truth, he was not. He shall not be permitted to allege his ignorance of the law; and it shall be considered a voluntary payment.

The law is stated with accuracy and fullness by DEWEY, J., in the case of *Boston, etc., Glass Co.* v. *City of Boston, supra,* where it is said: "The legal principle relied upon, on this point, is this: that if a party, with full knowledge of all the facts of the case, voluntarily pays money in satisfaction or discharge of a demand unjustly made on him, he cannot afterward allege such payment to have been made by compulsion, and recover back the money, even though he should protest, at the time of such payment, that he was not legally bound to pay the same. The reason of the rule, and its propriety, are quite obvious, when applied to a case of payment upon a mere demand of money, unaccompanied with any power or authority to enforce such demand except by a suit at law. In such case, if the party would resist an unjust demand he must do so at the threshold. The parties treat with each other on equal terms, and if litigation is intended by the party of whom the money is demanded, it should precede payment. If it were not so, the effect would be to leave the party who pays the money the privilege of selecting his own time and convenience for litigation; delaying it, as the case may be, until the evidence, which the other party would have relied upon to sustain his claim, may be lost by the lapse of time and the various casualties to which human affairs are exposed.

"The rule alluded to, when properly applied, is doubtless a salutary one, and is not to be departed from, but in cases resting upon a plain and obvious distinction from such as are ordinarily and familiarly known as embraced within it. But the rule has its exceptions; and cases are not unfrequent, in which the party paying money upon an illegal demand, and

knowing it to be such when making the payment, has been allowed to recover back the money. If there be a controlling necessity in the case, arising from the peculiar circumstances under which the money is demanded, the rule does not apply. Thus where money is extorted by duress of goods, assumpsit will lie for it, as was held in the early case of *Astley* v. *Reynolds*, 2 Stra. 916, where the defendant had in pawn plate of the plaintiff, which he refused to deliver without the payment of the money illegally claimed; and it was held to be a payment by compulsion."

The case of *Astley v. Reynolds*, *supra*, being one of the earliest cases found in the books, and being the one upon which nearly all the subsequent cases are based, deserves a more careful examination than is given in the above case.

The facts of the case are as follows: "In an action for money had and received to the plaintiff's use, the case reserved for the consideration of the court was, that about three years ago, the plaintiff pawned plate to the defendant for twenty pounds, and at the three years' end came to redeem it, and the defendant insisted to have ten pounds for the interest of it, and the plaintiff tendered him four pounds, knowing four pounds to be more than legal interest. That the defendant refusing to take it, they parted; and at some months' distance the plaintiff came and made a second tender of the four pounds, but the defendant still insisting upon ten pounds, the plaintiff paid it, and had his goods: and now brings this action for the surplus beyond legal interest."

The court say: "The cases of payment by mistake or deceit, are not to be disputed; but this case is neither, for the plaintiff knew what he did, and in that lies the strength of the objection; but we do not think the tender of the four pounds will hurt him, for a man may tender too much, though a tender of too little is bad; and where a man does not know exactly what is due, he must at his peril take care to tender enough. We think also, that this is a payment by compulsion; the plaintiff must have such an immediate want of his goods, that an action of trover would

not do his business; where the rule *volenti non fit injuria* is applied, it must be where the party had his freedom of exercising his will, which this man had not. We must take it he paid the money relying on his legal remedy to get it back again."

In *Shaw* v. *Woodcock*, 7 B. & C. 73, reported in 14 Eng. Com. Law Rep. 18, BAYLEY, J., says: "If a party has in his possession goods or other property belonging to another, and refuses to deliver such property to that other, unless the latter pays him a sum of money which he has no right to receive, and the latter, in order to obtain possession of his property, pays that sum, the money so paid is a payment made by compulsion and may be recovered back."

HOLROYD, J., in the same case, said: "Upon the question whether a payment be voluntary or not, the law is quite clear. If a party making the payment is obliged to pay, in order to obtain possession of things to which he is entitled, the money so paid is not a voluntary, but a compulsory payment, and may be recovered back; and if the plaintiff below, therefore, was compelled to make the payment in question in order to get the policies of insurance, whether there was a pressing necessity or not, he has a right to recover it back."

In *Moses* v. *Macferlan*, 2 Bur. 1005, Lord MANSFIELD, after laying down the cases in which an action for money had and received will not lie, says: "But it lies for money paid by mistake; or upon a consideration which happens to fail; or for money got through imposition, (express, or implied;) or extortion; or oppression; or an undue advantage taken of the plaintiff's situation, contrary to laws made for the protection of persons under those circumstances."

In *Stevenson* v. *Mortimer*, Cowper, 805, the plaintiff recovered, in an action for money had and received, an excess of fees by him paid to a custom-house officer, to obtain a document he was under the necessity of preserving.

In *Ripley* v. *Gelston*, 9 Johns. 201, the plaintiff recovered, in *assumpsit*, of the collector of New York, money illegally

claimed by him as tonnage and light money, and which the plaintiff paid to obtain a clearance of his vessel.

In *Clinton* v. *Strong*, 9 Johns. 370, money was reclaimed which had been wrongfully exacted by the clerk of the district court for the redelivery of property which had been seized.

In *Chase* v. *Dwinal*, 7 Greenl. 134, the court held, that where money has been paid under such duress or necessity as may give it the character of a payment by compulsion, such as money paid to liberate a raft of lumber detained in order to exact an illegal toll, it may be recovered back.

The court, after laying down the rule in cases of voluntary payments, says: "But this rule applies where the party has a freedom in the exercise of his will, and is under no such duress or necessity as may give his payments the character of having been made upon compulsion. It has been laid down as a general principle, that an action for money had and received lies for money got through imposition, extortion, or oppression, or an undue advantage taken of the party's situation."

The case of *Maxwell* v. *Griswold*, 10 How. U. S. 242, was an action to recover back money paid to the collector of the city of New York, which was alleged to have been illegally demanded and collected. The court found that the collector had demanded and received more money than was due, and that the same had been paid under protest. It was claimed on behalf of the collector, that the money had been voluntarily paid, and could not be recovered back. Upon that point the court say: "But the gist of the point is, were these increased duties in truth paid voluntarily, in the meaning of that term as applicable to the present subject? We have already seen, that the importer did not at first propose to enter his goods of such a value as to justify these increased duties. On the contrary, he insisted on entering them at only the price for which he purchased them, with charges, and thus agreeing with his original invoice, while the collector virtually insisted on having them appraised at

their increased value as at the time of the shipment, such being the usage in the custom-house at New York, and such the requirement of the circular of the secretary of the treasury, November 24th, 1846. The importer, knowing that this would subject him to a severe penalty, in order to avoid it, felt compelled to add to his invoice the amount which the price had risen between the purchase and the shipment. .

"But this addition and consequent payment of the higher duties were so far from voluntary in him, that he accompanied them with remonstrances against being thus coerced to do the act in order to escape a greater evil, and accompanied the payment with a protest against the legality of the course pursued toward him.

"Now, it can hardly be meant in this class of cases, that to make a payment involuntary, it should be by actual violence or any physical duress. It suffices, if the payment is caused on the one part by an illegal demand, and made on the other part reluctantly and in consequence of that illegality, and without being able to regain possession of his property except by submitting to the payment.

"He was unwilling to pay either the excess of duties or the penalty, and must be considered, therefore, as forced into one or the other by the collector, *colore officii*, through the invalid and illegal course pursued in having the appraisal made of the value at the wrong period, however well meant may have been the views of the collector.

"The money was thus obtained by a moral duress, not justified by law, and which was not submitted to by the importer, except to regain possession of his property withheld from him on grounds manifestly wrong."

The following authorities were referred to in the above case: *Clinton v. Strong,* 9 Johns. 370; *Ashmole v. Wainwright,* 2 A. & E. N. s. 837; *Irving v. Wilson,* 4 T. R. 485; Cowper, 69, 805.

But it is maintained by counsel for appellants that the appellee should have refused to pay the freight demanded, and should have replevied his property. The appellee had the

right to replevy his cattle before payment, but having paid the money demanded, he now has the right to recover the sum back, if it was not voluntarily paid.

In the case of *Chase* v. *Dwinal supra,* the court say: "The party injured often finds a convenience in being allowed to select one of several concurrent remedies. In the case under consideration, replevin would have restored the property unlawfully seized. But to procure a writ, and an officer to serve it, would have occasioned delay, which might have subjected the plaintiff to greater loss than the payment of the money demanded. Besides, he must have given a bond to the officer to prosecute his suit; and he might meet with difficulty in obtaining sufficient sureties. Had he brought trespass, several months might have elapsed before he could have obtained a final decision, and this delay might have been attended with serious inconvenience. By the course pursued, these difficulties were avoided. Nor is the defendant placed by it in any worse situation."

The foregoing authorities very fully establish the propositions, that the doctrine of duress applies to property as well as to the person, and that where one person is in possession of the goods or property of another, and refuses to deliver the same up to that other, unless the latter pays him a sum of money which he has no right to receive, and the latter, in order to obtain possession of his property, pays that sum, the money so paid is a payment by compulsion, and may be recovered back.

But the above propositions of law are not decisive of the case under consideration, for the reason that the appellants were not in the actual possession of the appellee's cattle at the several times when the money was paid.

The evidence discloses the following facts: The appellee had, while the recent rebellion was in existence, a contract to furnish the government with a certain number of beef-cattle, which contract extended for only two months. The appellee, for the purpose of filling such contract, went to the city of Chicago, where, as he alleges, and as the jury

found, he made a contract with the appellants to ship cattle from such city to the city of Indianapolis, at the rate of sixty-five dollars per car load. Having secured transportation for his cattle, he left an agent in Chicago to purchase and ship them, and he returned to the city of Indianapolis to receive the cattle and complete his contract with the government. The first shipment consisted of two car loads. When the cattle arrived, they were sent by the local agent of appellants to the cattle yards of the appellee. Some days after the cattle had been received, Parmelee sent to the appellee a bill for the transportation of such cattle, amounting to the sum of two hundred and one dollars and two cents. The appellee refused to pay such bill, but went to see Parmelee, and informed him that he had a contract for the shipment of such cattle at sixty-five dollars per car load. Parmelee said he had no knowledge of such a contract; that he made out the bills from the way-bills, and that such bills must be paid as he made them out. The appellee then informed such agent that he was expecting other shipments of cattle under such contract, whereupon the agent declared that he would not deliver any other cattle until the freight was paid as he made it up from the way-bills. Such agent also informed appellee that there were some other items in the first bill other than freight, but he could not give the items or the amount thereof. The appellee insisted upon his contract; the agent insisted upon the payment of the bills for freight as he should make them out from the way-bills, and refused to deliver any other cattle without payment. The appellee remonstrated against being compelled to pay what he considered to be unjust. It was then agreed that the agent of the appellants was, upon the arrival of the other cattle, to send them to the cattle yards of the appellee, and was to make out the bills and send them to the appellee, who agreed to pay the first and all subsequent bills under protest, reserving the right to recover back from the appellants all money which he should pay in excess of the legal freight. In pursuance of such agreement, the agent of

appellants delivered the cattle as they arrived at the cattle yards of the appellee, who, after the cattle had been so delivered, paid the bills for freight, as made out and presented by such agent.

The question presented for our decision is, whether money paid, under the above state of facts, in excess of the proper and legal freight, can be recovered back.

In our judgment, the money so paid can be recovered back upon two grounds. In the first place, it was agreed and understood between the parties that the payment should not be regarded as a voluntary payment, and that the appellee should have the right to sue for and recover any money in excess of the just and legal freight; and the appellee having been thus induced to pay an unjust and illegal demand, the appellants ought to be and are estopped from alleging that the money was voluntarily paid.

In the second place, we are of opinion that the money so paid could be recovered back if there had been no valid agreement that it might be. While the appellants were not in the actual possession of the cattle of the appellee, they possessed such power and control over the shipment and delivery thereof as gave them an undue advantage over the appellee, and the necessity of the appellee was so great and pressing as to deprive him of the freedom of his will. The unjust and wrongful demand of the appellants, and the necessities of the appellee, coerced him to make the payments, but he made them under protest, and accompanied them with remonstrances against the injustice of the demand made upon him. In the case of *Maxwell* v. *Griswold*, *supra*, the importer submitted to the unjust and illegal demand made upon him by the collector, to avoid a greater evil, and the court held that he acted under moral duress, and that he could recover back the money which the law thus coerced and extorted from him. The parties did not stand upon equal terms. The appellee had to perform his contract with the government, or sustain not only loss of profit, but subject himself to damages. The contract being

limited to two months, he had no time to purchase other cattle, or procure shipment by a different route. The appellants refused, in advance, to deliver any future shipments, unless the bills ·of freight were paid as made out from the way-bills. There were six shipments of cattle, and if the appellee had resorted to the action of replevin, he would have been compelled to have brought six separate suits. To require this would have been unreasonable and oppressive. It is well settled, by an unbroken current of authorities in England and in this country, that money can be recovered back which has been procured through imposition, extortion, or oppression, or where an undue and unconscionable advantage has been taken of the situation or great and pressing necessity of a person, who, by means thereof, has been coerced into the payment, which gives such payment the character of a compulsory payment.

It is next insisted by the appellants that the court erred in giving to the jury the first, second, and fourth instructions asked by the plaintiff. We have carefully considered such instructions. In our opinion, it is not necessary to set them out in this opinion, or review them, as they involve the same questions of law that we have so fully considered already. If the instructions complained of stood alone, they might have possibly mislead the jury, but when taken in connection with the very full and accurate instructions given by the court of its own motion, we think they did not do the appellants any harm. The instructions, when considered together, were as favorable to the appellants as they had a right to ask.

It is next claimed that the court erred in suppressing some portions of the depositions of Homer E. Sargent and Thos. Hoops. We do not think so. The portions suppressed were wholly immaterial and irrelevant to the present case. They related to certain shipments made from Chicago to New Albany. A detailed statement is made of the number of cars loaned by The Michigan Central Railroad Company to The Louisville, New Albany, and Chicago Railroad Com-

pany, the number of cars that were south of Michigan City at the time, and the expense and trouble to which the former company was put to secure a return of such cars. We are unable to see how such evidence could have had any bearing upon the case under consideration.

It is finally maintained that the damages assessed are excessive, and that the verdict is not supported by sufficient evidence. We have read the entire evidence, and entertain no doubt that the verdict was right.

The judgment is affirmed, with costs.

OSBORN, J., was absent, and took no part in the decision of this case.

*J. S. Tarkington, J. E. McDonald, A. L. Roache,* and *E. M. McDonald,* for appellants.

*W. Morrow* and *N. Trusler,* for appellee.