## WILEY v. PARMER.

1. The act of February, 1846, taxing the slaves of non-residents higher than those of resident citizens, is contrary to the constitution of the United States, and void for the excess.
2. Whether the legislature cannot pass a law discriminating between resident and non-resident owners of slaves, when the object is not taxation, but a regulation of internal police, *quere*.

Error to the Circuit Court of Barbour. Before the Hon. G. D. Shortridge.

J. G. SHORTER and E. W. PECK, for the plaintiff in error, to show that the act of the legislature referred to in the record, was unconstitutional, referred to the following cases: Ward v. Morris, 4 Har. & McHen. 341; Campbell v. Morris, 3 Ib. 554; Murray v. McCarty, 2 Munf. 298; Corfield v. Cargill, 4 Wash. C. C. Rep. 381.

COCHRAN & SAYRE, for defendants.

CHILTON, J.—The plaintiff in error brought his action of assumpsit in the circuit court of Barbour county, against the defendant in error, who was the tax collector for said county, to recover the sum of $239 29, collected by the latter as taxes, under an act of the legislature of the State of Alabama, approved February, 1846, entitled "an act to raise an additional amount of revenue to support the state government, and to maintain the faith and credit of the State of Alabama," the first section of which act is in the words following: "Section 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama, in general assembly convened,* That there shall be assessed and collected on all slaves in this state, the property of non-residents, over ten and under fifty years of age, a tax of two dollars each, and on those under ten, one dollar each."

At the time of the passage of this statute, as well as when the money sued for was collected, the tax upon the same property as against a citizen resident in this state, was one half the amount to be assessed and collected by this act against non-residents.

By a statement of facts agreed on between the parties upon the trial of the cause in the circuit court, it appears the sum of $239 29 was collected by the defendant in error as taxes, over and above the amount which by law he was allowed to collect from one of our own citizens, this sum being collected by reason of the said plaintiff's non-residence, under and by virtue of the act above refererred to. The plaintiff having demanded the money of the defendant before bringing his action, insisted upon his right to recover, alledging the section of the law under which the money was collected was unconstitutional, and therefore inoperative. The circuit court gave judgment for the defendant, and the plaintiff by his assignment of error now presents for our revision the correctness of that judgment.

The question presented is one of grave import, not only as involving the constitutionality of an act of a co-ordinate department of the state government in the exercise of one of the attributes of its sovereignty—the power of taxation—but as affecting the revenue of the state. I have given it all the consideration which my time would allow me to bestow, and have anxiously endeavored to reconcile the law complained of with the constitution of the United States, which I am solemnly bound to support, and which is the supreme law of the land, the constitution and laws of any state to the contrary notwithstanding. I have been unable to do so, and feel bound to declare, that in my opinion, the first section of the act of 1846, is unconstitutional and void. I will briefly state the reasons that impel me to this conclusion.

The framers of the constitution of the United States, desirous of strengthening the bonds of union, and preserving the liberty and happiness of the *whole people* by uniting them in one common brotherhood upon principles of just equality, and doubtless foreseeing that the states, by reason of their diversified conditions, their conflicting interests, resulting from their geographical positions and different pur-

Wiley v. Parmer.

suits, might in after times indulge in partial legislation, making discriminations in favor of their own citizens, and imposing burthens upon citizens of other states, from which their own citizens should be exempt, wisely ordained as a part of the fundamental law, "that the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." See § 2, 4th Article of the Consititution U. S. A similar article, yet expressed in language somewhat confused, was incorporated in the confederation, by which it was declared, " that the free inhabitants of each of these states, paupers, vagabonds, and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several states; and the people of each state, shall in every other, enjoy all the privileges of trade and commerce, subject to the same duties, impositions and restrictions, as the inhabitants thereof respectively," &c. The provision in the constitution avoids all circuity of expression, and all confusion, is plain, simple, and its object easy of comprehension. By it, the citizens of the different states are, as it respects the privileges and immunities they enjoy in their respective states, brought into a general citizenship with each other. If, for example, in the states of Georgia or Mississippi, the citizens of those states have the right to purchase and hold lands free of charge, or contribution to the state, that right or privilege is guaranted to every citizen of Alabama—of every state. If to preserve the faith of the state in the discharge of her obligations, or for the support of her government, in the exercise of her sovereignty, the state enacts that a tax or contribution be levied upon the land or property of the citizens of that state, whatever sum will exempt their property from such burthen or contribution, will exempt my property in that state, else they share an exemption, an immunity, which I do not. I do not wish to be understood as holding that the State of Alabama has not the power to enact whatever laws may be necessary to promote the peace and domestic interests of its citizens, and such police regulations as may be deemed necessary to protect or control this peculiar species of property, which are taxed in the first section of the act referred to. This power the states reserved as essential to their existence

and well being as separate communities, while such powers only were conferred upon the general government as affect those interests common to all the states considered as a confederate nation. If the slaves of a non-resident are turned loose upon our community, without the control or guidance of their owner, there cannot be the slightest doubt but that the state possesses the most ample power to adopt such police regulations as shall effectually remedy the evil. But the act under consideration is not of this character. It is not a penalty inflicted on the owner for living apart from his slaves, and for withholding his personal control and superintendence over them. In a law of this character, there would doubtless have been exceptions in favor of those who had faithful, vigilant overseers and superintendants to protect the state against the supposed evil consequences resulting from property thus situated.

But this section imposes "*a tax;*"—a tax upon the slaves of *non residents*, double that imposed by the then existing law upon slaves of resident citizens, not for the purpose of enforcing any duty or obligation on the part of the master or owner with respect to the slaves—not with a view of protection to the State against any evil resulting from the situation of the property, but as we are distinctly advised by the title of the act, "*for the purpose of raising an additional amount of revenue to support the State government, and to maintain the faith and credit of the State of Alabama.*" If such discrimination is warranted by the constitution in favor of our own citizens and against the citizens of our sister States, where shall it cease? If we allow the principle at all, we must allow that the State has the power to exempt her own citizens from taxation, and to support the government and pay her debts by taxing the property of our non-resident brethren who have invested their fortunes among us, under the protection of our laws and the guaranty of the federal constitution. True, the magnanimity of the State, and a proper sense of justice, which we must intend ever influences her legislative action, forbid such an idea, but this is no answer to the question, whether, in the formation of the federal constitution, such power was not relinquished by the States. Whether the reservation of such power to be exercised by

them would not in its tendency have been most obviously subversive of some of the great ends of the confederated union—the establishment of justice and the insuring domestic tranquility. It is however needless to pursue the argument further. In my opinion, the second section of the fourth article of the constitution of the United States, above quoted, entitles the plaintiff in error to all immunity from taxation as respects his property in this State, which is enjoyed by citizens of this State, and that the first section of the act of February, 1846, imposing a tax of $2 on each slave over ten years of age, and one dollar on each slave under that age, being confined exclusively to the slaves of non-residents, is unconstitutional, and furnished no warrant for collecting from the plaintiff in error a greater amount of taxes than was collectable from citizens of this State, and that the judgment of the circuit court should be reversed, and a judgment here rendered for the plaintiff for $239 29, with interest from the time of the demand, to be ascertained by the clerk.

The construction for which I contend is substantially sustained by the cases, Commonwealth v. Griffin, 3 B. Monroe's Rep. 211; Campbell v. Morris, 3 Harris & McHen. 554; Ward v. Morris, 4 Ib. 341; Murry v. McCarty, 2 Munf. 298; Corfield v. Cargill, 4 Wash. Cir. Ct. R. 381; Serg. Con. 393; 3 Story on Con. 675. The court is unanimous in this opinion, and conclusion attained. The judgment is reversed, and is accordingly here entered.

COLLIER, C. J.—The phraseology of the act of February, 1846, as well as its title, conclusively indicate that its sole purpose was to raise a revenue to meet the exigencies of the State; and the question arising upon the first section is, whether it is competent for the legislature to discriminate in imposing a tax on slaves, between the property of residents and non-residents, so as to subject the slaves of the latter to a double charge?

By the second section of the fourth article of the federal constitution, it is enacted, that " the citizens of each State, shall be entitled to all privileges and immunities of citizens in the several States." It has been held that the intention of this clause was to confer on the citizens of each State a ge-

neral citizenship; and to communicate all, the privileges and immunities, which the citizens of the same State would be entitled to, under the like circumstances. Corfield v. Cargill, 4 Wash. C. C. Rep. 371; Livingston v. Van Ingen, 9 Johns. Rep. 507. In Campbell v. Morris, 3 Har. & McH. Rep. 535, it was said that the terms *privilege and immunity* are synonymous, or nearly so; *privilege*, signifies a peculiar advantage, exemption, immunity; *immunity*, signifies exemption, privilege. A particular and limited operation is to be given to the words "immunities and privileges" in this section of the constitution, and not a full and comprehensive one. They do not mean the right of election, of holding offices, or of being elected. The object of the entire provision was to secure to the citizens of all the States the peculiar advantage of acquiring and holding real as well as personal property, and to provide that such property shall be protected and secured by the laws of the State in the same manner as the property of the citizens of the State is protected. It means such property shall not be liable to any taxes or burdens, which the property of the citizens is not subject to. It may also mean that as creditors, the citizens of other States shall be on the same footing with the State creditor, in the payment of the debts of a deceased debtor, &c. It secures and protects personal rights. See also Ward v. Morris & Nicholson, 4 Har. & McH. Rep. 330; Murray v. McCarty, 2 Munf. Rep. 393; Amy v. Smith, 1 Litt. Rep. 326.

These citations have been often recognized as correct expositions of the constitutional provision referred to; and if they are to be followed, it is perfectly clear that the first section of the revenue act of 1846, cannot be supported. It is needless to amplify this opinion, as the question has been largely and lucidly considered in several of the cases cited.

Slaves, it must be conceded, are a *unique and peculiar description of property*, and that it is competent for the legislature to enact regulations of *internal police* in respect to them, which *may discriminate between the resident and non-resident master*. These measures of *police* may be so framed as to subject the non-resident to heavier pecuniary burdens; and *perhaps it is within the competency of legislation to pro-*

*hibit all persons but "emigrants"* from bringing and settling their slaves in this State. See Ala. Const. 6 Art. tit. Slaves. But we will not travel out of our way to consider these suggestions, as the statute before us, we have seen, was intended to raise a revenue, and not to regulate to any extent the police of the State. See The City of New York v. Miln, 11 Pet. Rep. 102; Groves v. Slaughter, 15 Pet. Rep. 449; Prigg v. The Commonwealth of Pennsylvania, 16 Pet. Rep. 539; Thurlow v. Massachusetts, 5 How. Rep. 504. I have but to add my concurrence in the judgment of reversal.