# WHEELING.

## W. Va. Transportation Co. *v.* Sweetzer.

Submitted June 26, 1883.—Decided March 21, 1885.

1. If a person be engaged in buying oil in an oil-region and shipping it over a railroad, and there is no other outlet for this oil except over this railroad, and under these circumstances he agrees to pay to the railroad company more than its legal rates of charge for the freight of such oil and does make such payments from time to time, in order that he may get his oil transported to market in the only manner, in which he can tranport it, though such payments are made after each shipment of oil has been made and the oil delivered, such person must be considered as making such payment not voluntarily but by compulsion, and he has a right in an action for money had and received for his use to recover back the excess of freight so paid by him over the amount, which the railroad company had a legal right to charge, or to offset this excess against the railroad company's charge, if it brings an action of *assumpsit* against such shipper. (p .444.)

2. In such action to recover back such excess of payments made beyond the legal rates of charge there is no necessity for the

plaintiff to prove, that he demanded the repayment of such excess by the railroad company before instituting such suit. (p. 464.)

3. The principles decided in *The Laurel Fork and Sand Hill Railroad Company* v. *The West Virginia Transportation Company*, *supra*, approved and acted upon. (p. 465.)

Statement by GREEN, JUDGE :

The West Virginia Transportation Company, a corporation of this State, in 1878 brought an action of *assumpsit* in the circuit court of Wood county against Moses Sweetzer for freight on oil, storage, cash paid by the plaintiff to the Baltimore & Ohio Railroad Company for the use of the defendant at the request of the plaintiff, for freight on that road and for services and inspection of oil for defendant. The declaration contained nothing but the proper common counts including a count for money had and received, and with it was filed a bill of particulars containing a detailed account of the claims of the plaintiff amounting in all to $178.41. The declaration was filed at the August rules, 1878. The defendant pleaded *non-assumpsit*, payment and set-off, on which issues were joined. With his plea of set-off the defendant pleaded a specification of offsets. It consisted of thirty-two items, "to cash paid freight on a specified number of barrels of oil for not exceeding four miles to Laurel Junction," the date of said items of payments of freight being severally given. The aggregate of freight so specified as paid at given dates between May 8, 1877, and May 8, 1878, was $609.31; and on each of said dates of payment there was credit given for certain specified sums as "legal rates for transportation by you of said oil on said railroad to Laurel Junction." The aggregate amount of these legal charges as specified in this bill of particulars was $217.70, leaving a balance of $392.11 due to the defendant for over-payments of freight.

The issues joined were tried by a jury, who on September 24, 1879, found a verdict for the defendant, Moses Sweetzer, on the issues joined for $240.46. A motion was made by the plaintiff for a new trial, which the court refused, and on October 18, 1879, rendered a judgment for the defendant for $240.46 with interest thereon from September 24, 1879, the date of the verdict, and for his costs.

During the progress of this case the plaintiff took four bills of exceptions. Bill of exceptions No. 1 set out all the evidence. The plaintiff proved his account to be correct by a witness. The freight charged was thirty-five cents per barrel of forty gallons each, which did not exceed in weight one-seventh part of a ton; also certain charges named were made by the plaintiff, to all of which charges the defendant agreed in writing by signing a printed memorandum, which was filled up. The plaintiff's bill of particulars was calculated from this memorandum and was correct according to the rates of charge named in the memorandum. They were calculated from the amount of oil which was placed on the railroad, and not from the amount of oil delivered, which fell short of that charged, which difference may have been caused by evaporation of the oil. The plaintiff's witness also proved that the defendant's bill of offsets was correct, and that the plaintiff's books showed, that the plaintiff had received for freight the sums therein charged by the defendant at the dates specified in the bill of offsets.

Another witness of plaintiff proved, that the plaintiff at the time specified in the defendant's bill of sets-off and since has controlled all means of public transportation from the oil-district, where the defendant was engaged in the oil-business and shipped his oil, which was transported by the plaintiff over its railroad a distance not exceeding four miles to Laurel Junction on the Baltimore & Ohio Railroad, to be thereon transported to market in Baltimore. All oil from this oil-district would have to pass necessarily over the plaintiff's railroad. The charge made was thirty-five cents per barrel on the oil, whether it was placed directly on the railroad by the defendant or conducted to it by pipes of the plaintiff, there being no separate charge for this pipe-service. The defendant proved, that " he had been engaged in the oil-business in the said oil-district for a number of years in buying, selling and dealing in oil; that he had, at the date specified in his offsets and in the plaintiff's account, no means of getting his oils to market by public conveyance or by public carriers save over routes and means of transportation controlled by the plaintiff; that he was obliged, in order to carry on his business, to ship his oils by the plaintiff's lines and over the said

Laurel Fork and Sand Hill Railroad; that he paid the amount specified in his specification of offsets by having the same deducted from the proceeds of oils shipped over plaintiff's railroad; that he did not know when said payments were made what amount was charged by the plaintiff; that the freight charges were presented in a gross sum, and included the total charges on all routes from the point of shipment on plaintiff's line to the destination of the oil in distant cities, and at points far removed from the plaintiff's lines; that such charges followed defendant's oils, and were paid without the defendant being able to find how much of such gross sum was paid to plaintiff and how much to other carriers; that defendant, time and time again, when he could learn of the charges made by plaintiff, complained and protested to M. C. C. Church, the secretary and manager of the plaintiff, about such charges, and declined to pay them, but the plaintiff, through its agent, informed him that defendant must comply with its terms or he could not get his (defendant's) oil, and that no reduction would be made, and that the defendant was required and compelled by the plaintiff to pay the rates and amounts charged by the plaintiff in order to get defendant's oil transported to market, and defendant was compelled to pay such charges and to transport his oils over the said railroad, or suffer his business to be broken up; that of the items charged in defendant's offsets, defendant did not know as to many of them that the payments therein charged had been made to plaintiff until months after the plaintiff had received the money; and in cases where the defendant had the means of knowing the amounts charged by the plaintiff, the defendant was informed by the plaintiff that he could not get his oil until he had settled the plaintiff's charges thereon, but that no oil was withheld from him by reason of the non-payment of the charges. This witness stated further that he did not know whether the plaintiff's account was correct or not. He did at one time offer to pay J. M. Brown for plaintiff the amount of said account, except $3.00 or $4.00 charged for transportation of oil not delivered; that the offer was made but not accepted; that the defendant objected to signing the paper marked 'certificate' and shown him, until he was informed that he could not get the oil therein mentioned

unless he did so sign said paper; that the defendant had bought of one Kennelly the oil mentioned in said certificate, and received the certificate as evidence of the ownership of the oil."

He also proved by the plaintiff's books the correctness of his bill of offsets except the credits, which he had inserted of what he deemed the legal freight at twenty cents per ton per mile; and that nearly all the oil shipped was placed by the defendant on the railroad in barrels and did not pass through the plaintiff's tubes, though there were two or three exceptions, in which oil shipped did pass through plaintiff's tubes first. There were also offered in evidence the acts incorporating and relating to the plaintiff and the Laurel Fork and Sand Hill Railroad Company, that is, acts found in Acts of 1866 page 112, Acts of 1868 page 30, Acts of 1867 page 110, Acts of 1868 page 63, and Acts of 1869 page 8.

"And thereupon the defendant rested his case, and the above statement contained all the evidence offered and relied upon by the defendant to sustain the issue on his part and to prove his said account of offsets. Whereupon the plaintiff moved the court to exclude from the jury all the evidence adduced by the defendant so far as the same proved, or tended to prove, the said defendant's account of sets-off, upon the following grounds:

"1. Because the account thereof filed does not give the plaintiff notice of the nature of said sets-off, as required by the statutes in such cases made and provided.

"2. Because the payments proven to have been made were voluntary payments.

"3 Because there was no evidence that the money claimed in said account of sets-off had ever been demanded by the defendant of the plaintiff before the filing of said account in this action.

"Which motion being argued by counsel and considered by the court, was overruled, and the jury were permitted by the court to consider said evidence, and did consider the same. To which ruling of the court overuling the said motion to exclude said evidence and permitting the jury to consider the same, the plaintiff, by its counsel, excepted, and this its bill of exceptions No. 1 tendered, and pray that the

same may be signed, sealed and saved to it, which is accordingly done.

"JAS. M. JACKSON. [SEAL.]"

"BILL OF EXCEPTIONS NO. 2.

"Be it remembered that upon the trial of this cause, after the evidence had been offered to the jury, set forth in bill of exception No. 1, which is made part of this bill of exceptions, and before the jury retired from the bar to consider of their verdict, the defendant requested the court to instruct the jury as follows: ·

"The court instructs the jury that if they believe from the evidence that the Laurel Fork and Sand Hill Railroad Co. was an incorporated company, and its road did not exceed thirty miles in length, and that said road was operated by steam power at the respective dates of the items charged in the defendant's specifications of off-sets filed in this cause, then the legal rates of transportation of oil over the line of said road was not exceeding twenty cents per ton per mile, and the defendant is entitled to recover any excess over said rate paid for the transportation of the oil in the said specifications of off-sets mentioned over the line of said road by the defendant to the plaintiff as the lessee of the Laurel Fork and Sand Hill Railroad Co., if such payments were made under duress and not voluntarily—unless the jury should further believe from the evidence that the freight charged on said oil included also charges for tubing or pumping the same through the pipe-lines of the plaintiff, in which latter case the plaintiff might lawfully charge the rates fixed in its charters of 1867 and 1868.

"To the giving of which instruction the plaintiff, by its counsel objected, but the court overruled the objection and gave the same. To which ruling and opinion of the court in giving said instruction to the jury, the plaintiff, by its counsel, excepted, and this its bill of exception No. 2 tendered, and prays that the same may be signed, sealed and saved to it, and made part of the record of this cause, which is accordingly done.

"JAS. M. JACKSON. [SEAL.]"

"BILL OF EXCEPTIONS NO. 3.

"Be it remembered that upon the trial of this cause, after

the evidence had been offered to the jury set forth in bill of exceptions No. 1, and which is made part of this bill of exceptions, and before the jury retired to consider of their verdict, the plaintiff, by counsel, requested the court to give to the jury the following instructions :

" That if the jury believe from the evidence that the defendant voluntarily made the payment in his accounts of sets-off mentioned, with full knowledge, or means of knowledge, of all the facts relating thereto, and without duress of his person or goods, then he cannot recover on his said sets-off.

"Which said instructions the court gave, and upon being asked by the counsel for defendant to explain to the jury what duress was, the court added to said instruction as follows :

"That duress is any improper means brought to bear upon a party whereby he is not a free agent, and if the jury believe that the defendant was placed in such a condition by the plaintiff that he could not get his goods to market (the oil mentioned in the sets-off), or get them out of the plaintiff's possession without paying for freight thereon to Laurel Junction at a rate exceeding twenty cents per ton per mile over the line of said Laurel Fork and Sand Hill Railroad Company, then that constituted such duress of goods as would entitle the defendant to recover upon his said sets-off, provided the jury believe from all the evidence that the plaintiff did charge the defendant for said transportation a rate exceeding twenty cents per ton per mile as charged in said sets-off, and that the plaintiff was operating by steam power the said Laurel Fork and Sand Hill Railroad, and that said railroad does not exceed thirty miles in length. To which opinion and ruling of the court, making the said addition as above mentioned to the instruction asked for by the plaintiff, and giving the said addition to the plaintiff by its counsel excepted, and prays that this its bill of exceptions No. 3 may be signed, sealed and saved to it, and made part of the record in this cause, which is accordingly done. .

"Jas. M. Jackson."

The fourth bill of exceptions was to the refusal of the court to grant a new trial. The evidence, which has not

been stated in detail, justified the verdict of the jury, as is admitted in this Court by the argument of the counsel for the West Virginia Transportation Company, they not controverting it as right if the court did not err in the matters set forth in the first three bills of exceptions.

A writ of error and *supersedeas* was granted to the plaintiff by this Court to the judgment of the circuit court rendered October 18, 1879.

*W. S. Sands* for plaintiff in error.

*Van Winkle & Ambler* for defendants in error.

GREEN, JUDGE:

The first ground of error assigned is, that the court erred in not excluding the defendant's proof of his bill of offsets, because the bill of particulars filed by the defendant did not give the plaintiff notice of the nature of the offsets as required by section four chapter one hundred and twenty-six of the Code of West Virginia. It is argued, that this bill of particulars was too vague to give the plaintiff notice of the nature of the defendant's claim, because its heading stated, that it was the amount paid by the defendant to the plaintiff or for its use for freight in excess of legal rates of freight. And it fails to state to whom this freight was paid. There is nothing in this objection. The nature of the claim is set forth with distinctness in the bill of particulars; and it might have been set forth with much less detail and still would have been amply sufficient to give to the plaintiff such distinct notice of the defendant's claim, which was simply that on all the oil transported by the plaintiff for the defendant for one year from and after May 3, 1877, it had overcharged the defendant, charging him within the limits of the rate allowed by the charter of the plaintiff but in excess of the rates allowed and fixed by the subsequent act of March 3, 1875. The evidence shows, that the plaintiff knew perfectly well what freights it had charged during that year, and what freights it had received of the defendant, there being no controversy or dispute about this, as was distinctly stated in effect by a witness of the plaintiff. And therefore a statement of the person or company, to whom the defendant had paid this

56

freight for use of the plaintiff, would have added nothing whatever to the clearness of the defendant's bill of set-off. The character of the dispute and the evidence clearly show, that the plaintiff was not taken by surprise by any vagueness in the defendant's bill of particulars. The court therefore did not err in refusing to exclude from the consideration of the jury the defendant's evidence tending to prove his set-off.

The next question involved in this record is : Did the plaintiff have a right during the year beginning May 8, 1877, to charge the defendant thirty-five cents per barrel for the transportation over its railroad four miles long ? This it was authorized to do by its charter, the limits of its charge being not more than seventy-five cents per barrel. (See Acts 1866, chapter 113.) Or was its rates of charges reduced by the acts of December 23, 1873, as amended by act of March 3, 1875, to twenty cents per ton per mile, which the evidence in this case shows would have been a little less than twelve cents per barrel instead of the charge already made of thirty five cents for the distance, which the defendant's oil was actually transported?

This precise question was decided by this Court in the *Laurel Fork and Sand Hill Railroad Company* v. *The West Virginia Transportation Company, supra*. It was there decided, that these acts of the West Virginia Legislature of December 27, 1873, and March 8, 1875, are binding on all railroad companies doing business in this State without regard to the provisions, which may have been inserted in their charters. In that case this Court confined this very company, The West Virginia Transportation Company, to twenty cents per ton per mile as its maximum rate of charges, as provided by these general acts, instead of allowing it to charge thirty-five cents per barrel as allowed by their charter. The question whether the West Virginia Transportation Company had after the time the general act of December 27, 1873, as amended by the act of March 8, 1875, went into effect establishing the maximum rate of charges for transportation, a right to charge higher rates than those fixed by this general act, because it had been by its charter previously granted authorized to charge higher rates, were so fully and so recently considered and decided by this Court, that we

deem it unnecessary to further consider this question, though it has been elaborately argued in this case. The arguments presented in this case on this point were fully considered in that case, both of the cases pending before this Court at the same time.

The next enquiry is: Was the payment of the excessive freights in this case paid voluntarily by the defendant, so as to preclude him from a right to demand of the plaintiff the amount, which he had paid in excess of the freights, which the plaintiff could have legally charged him with? It may be regarded as fully settled that money paid under a mistake of facts may be recovered back. (*Durkin & Henderson* v. *Cranston and others*, 7 Johns. 442; *Waite* v. *Leggett*, 8 Cow. 195.) It has been sometimes questioned, whether, when money has been voluntarily paid in ignorance or mistake of law, it can or can not be recovered back. Thus in *Haven* v. *Foster*, 9 Pick. 129, Morton J. said: "Whether money paid through ignorance of law can be recovered back, is a question much vexed and involved in no inconsiderable perplexity. We do not court the investigation of it."

In *Clarke* v. *Dutcher*, 9 Cow. 674, the cases were examined and this conclusion was reached by Sutherland J.: "Although there are a few dicta of eminent judges to the contrary, I consider the current or weight of authority as clearly establishing the position, that, when money is paid with full knowledge of all the facts, upon which it is demanded, or with the means of such knowledge, it cannot be recovered back upon the ground the party supposed he was bound in law, when in truth he was not. He shall not be permitted to allege his ignorance of law; and it shall be considered a voluntary payment."

In the case of *Mayor of Richmond* v. *Judah*, 5 Leigh 305, after a full review of the English cases the court concluded that, "Money paid under mistake or ignorance of fact may be recovered back, otherwise under a mistake or ignorance of law."

The more recent authorities have strengthened this conclusion, and it may be regarded as well settled, that money voluntarily paid upon demand, though the demand be un-

just can not be recovered back, where the party paying has full knowledge of all the facts. But though there are those who still contend, that, when money is paid under a mistake of law, which there was no ground to claim in conscience, the party paying it may recover it back, (see note to *Black* v. *Ward*, 15 American Reports page 171, where this conclusion is drawn after reviewing a number of cases,) yet I think that the conclusion I have stated above must now be regarded as settled and certainly in this State. (See note to *Marmett* v. *Hampton*, 2 Smith's leading cases 453. *Mayor* v. *Judah*, 5 Leigh 305 and *Haigh* v. *Building Association, W. Va.*) But the trouble is to determine, when a payment of an unjust demand is sought to be recovered, whether such payment was voluntary, or whether it was by compulsion. If it was not voluntary but by compulsion, it may be recovered according to all the authorities. But there is a great conflict among the decided cases as to what is a voluntary and what a compulsory payment, some courts holding a payment made under certain circumstances as a voluntary payment, while others under exactly the same circumstances holding such a payment as compulsory.

There are however some points, on which all the authorities are agreed. Thus where a person is compelled by duress of his person to pay a demand, and he makes the payment under protest; such payment is compulsory, and it can be recovered back. This is equally true, if the payment was compelled by duress *per minas*; for in this respect it is immaterial, whether the *duress* be duress of imprisonment or duress *per minas*, that is, threats sufficient to overcome the mind and will of a person of ordinary firmness. It may also be regarded as entirely settled by the authorities, that in some cases payment will be regarded as made on compulsion and not voluntarily, and the party making such payment will be entitled to recover it back, if its demand was unjust, though the payment was not made either under duress of imprisonment or *duress per minas*. All the authorities for instance agree, that, when the goods of the party making the payment have been illegally seized or are wrongfully detained, and to obtain possession of his goods the owner pays an unjust demand made upon him by the party holding his

goods, the money so paid may be recovered back as paid upon compulsion, though such seizure or detention of his goods is not duress of him.   At common law such seizure or detention of one's goods was neither duress of imprisonment nor *duress per minas.*   In fact it was not duress at all; but it has been sometimes improperly called duress of goods.

The earliest case where it was held, that duress of goods as above defined is such a compulsion, as would render the payment of an unjust demand made to relieve the goods of such duress involuntary and would authorize the recovering of the money so paid by compulsion, was the case of *Astley* v. *Reynolds,* 2 Stra. 916.   In that case the plaintiff pawned goods to the defendant to secure the loan of twenty pounds for three years.   The defendant refused at the end of the three years to give up the plate pawned, unless the defendant would pay back the twenty pounds borrowed and certain usurious interest thereon.   The defendant offered to pay back the money borrowed and legal interest thereon; but the defendant would not receive it and surrender the plate, but insisted, that the usurious interest should also be paid. Thereupon the plaintiff, to get possession of his plate, paid the defendant his whole demand and brought an action of *assumpsit* to recover back the amount of money so exacted from him.   The court says :

" We think that this was a payment by compulsion ; the plaintiff might have such an immediate want of his goods that an action of trover would not do his business; where the rule *volenti non fit iniuria* is applied it must be where the party had his freedom of exercising his will, which this man had not.   We must take it that he paid the money relying on his legal remedy to get it back again."

Some have said, that, to entitle any one to recover back money, which has been paid on an unjust demand, there must be either duress of one's person or duress of his goods. But clearly there are circumstances, in which a person may be placed, where he would have much less freedom of will in making a payment on an unjust demand, than he would have because of a duress of his goods; and accordingly there are very many cases to be found in the books, where a party paying an unjust demand has been allowed to recover it

back as paid on compulsion, though there was no duress of either his person or of his goods, because it was obvious, that the payments were made involuntarily and under so heavy a pressure, as to make the payments not only involuntary but really compulsory.

Some of these cases are based on the peculiar circumstances of the case, and no rule of law could well be deduced from them; and others, which are of more frequent occurrence, and from which a rule might be deduced, are cases in which the authorities differ. Thus in Massachusetts it has been said, that, when the payment of money has been made upon an illegal demand by one, who has authority to levy upon the property of the person, upon whom such demand is made, and by a sale of property to satisfy and discharge such claim, and when payment is made upon such demand to prevent such seizure and sale of property, the payment is compulsory. (*Boston & Sandwich Glass Company* v. *City of Boston*, 4 Metc. 181; *Amesbury Woolen and Cotton Manufacturing Co.* v. *The Inhabitants of Amesbury*, 17 Mass. 461; *Preston* v. *1he City of Boston*, 12 Pick. 7.) These statements in these Massachusetts cases or the doctrine stated in them has received considerable countenance from cases decided elsewhere. (*The Mariposa Co.* v. *C. C. Bowman*, Deady R. (U. S. Circuit and District Court Reports of Oregon and California) 228; *Hendy* v. *Soule*, *Id.* 400; *Erskine* v. *Vanarsdale*, 15 Wall. 76; *Harvey and Boyd* v. *Town of Olney*, 42 Ill. 336; *Bradford* v. *Chicago*, 25 Ill. 411; *Wiley* v. *Parmer*, 14 Ala. 627; *Crutchfield* v. *Wood*, 16 Ala. 702; *Town of Cahaba* v. *Barnett*, 34 Ala. 407; *Tuttle, Jr.* v. *Everrett*, 51 Miss. 27; *First National Bank* v. *Watkins*, 21 Mich. 483; *Atwell* v. *Zeluff*, 26 Mich. 118; *McKee* v. *Campbell*, 27 Mich. 500.)

On the other hand it was held in *Smith* v. *Redfield*, 27 Me. 145, that, if payment be made on an unjust demand to one having authority to enforce payment by sale of property, before there is any seizure of property, and when no immediate seizure of the property for sale was threatened, so that payment could not have been shown to have been made to avoid the seizure and sale of the property, such payment is voluntary and can not be recovered back by suit. This position receives countenance from and is apparently sustained by

many decisions, among which may be cited *New York and Harlem Railroad Co.* v. *Marsh*, 12 N. Y. 308; *Walker* v. *City of St. Louis*, 15 Mo. 563; *Phillips* v. *Jefferson, Co.*, 5 Kan. 412; *Taylor* v. *The Board of Health*, 31 Pa. St. 73; *Barnett* v. *The City of Cambridge*, 10 Allen 48; *Robinson* v. *The City of Charleston*, 4 Rich 317; *Morris* v. *Mayor of Baltimore*, 5 Gill 244.

The cases relied upon to sustain each of these opposing propositions were cases of payments made by tax-payers to collectors of taxes; and many of them, it seems to me, are in irreconcilable conflict. But many of them, which are in apparent conflict, may be reconciled by the differences in the laws of the different States, in which they were rendered, in reference to the powers and duties of different collectors of taxes and the modes provided for the collection of taxes, which are not paid. But I deem it unnecessary to form or express any opinion in reference to the correctness of the decisions in any of these cases; for, as I conceive, these cases arising from the payment of taxes afterward sought to be recovered back, throw little light upon the case before us of a payment made to an individual or corporation afterwards sought to be recovered back, because in deciding the cases of payments made to tax-collectors afterwards sought to be recovered back there enters necessarily such a variety of considerations, which can not properly enter into the consideration of cases of payments made to individuals and sought to be recovered back, that the first class of decisions can throw no certain light upon the decisions of cases of the second class.

I will here simply refer to a few of the considerations, which have entered into and controlled to a greater or less extent the decisions of cases of payments made to tax-collectors sought to be recovered back, and which are peculiar to this class of cases. The proper action to recover back money, which has been paid, when it can be recovered back, is, as all the authorities agree, an action of *assumpsit* for money had and received to the plaintiff's use. This is a kind of equitable action to recover back money, which ought not in justice to be kept; and it lies only for money, which *et æquo et bono* the defendant ought to refund. Now if a tax-collector

receive a tax by a misconstruction of law honestly made, and the tax-payer pays it also in ignorance of the law, and it be paid voluntarily, and the tax-collector pays it over to the State or to a municipal corporation, as the case may be, and the tax so paid is expended by the municipal corporation in the improvement of the municipality, it may be in improving a street or road in front of the tax-payer's property, it would seem altogether proper, that such tax-payer ought not to be permitted to recover such tax back from either the tax-collector of the State or municipality.    It would be obviously unjust to permit it to be recovered of the tax-collector, who did only what he as well as the tax-payer believed to be his duty, and who has not the money in his hands but has honestly paid it over to the State or municipality.    The tax-payer of course could not recover it against the State; for no suit can be brought against the State; and he could not justly recover it of the municipality which has honestly expended it perhaps in a manner directly enhancing the value of the real estate of the party paying the tax.    (*Taylor* v. *The Board of Health*, 31 Pa. St. 73.

Again, in some States the payment of certain municipal taxes cannot be enforced by a sale of property by the tax-collector; and the voluntary payment of such a tax to the tax-collector would stand on the same footing as the voluntary payment of a debt to a natural person.    This consideration had its weight in the case of the *Mayor, &c., of Richmond* v. *Judah*, 5 Leigh 305, where according to the syllabus. " A citizen of *Richmond* paid money to the corporation under a belief of both parties, that it was due for city-taxes imposed by an ordinance of the corporation, when it was not so due. Held, it cannot be recovered back."    That the fact, that the officer, to whom this tax was paid, had no means of coercing its payment, had its weight in this decision, appears in Judge Carr's opinion p. 315.

Again in some States a tax-payer may enjoin the collection of a tax, if it be an illegal tax.    When this can be done, it might well influence the decision of a case, where a tax-payer sought to recover back a tax which he had paid.    This question, whether the illegal tax could or could not be enjoined, seems to have been regarded as a material element in deter-

mining, whether an illegal tax paid could be recovered back. *Stephens, Treasurer of Lucas County* v. *Daniels et als*, 27 Ohio St. 535.    The numerous authorities on the question, whether an illegal tax paid can be recovered back, will show other circumstances entering into the decisions of the question, which are peculiar to such cases, and which render their authority of comparatively little weight, where the question is, whether a debt paid to an individual, which was not justly due, can be recovered back.    I shall therefore devote no more time to an examination  of these cases of illegal taxes paid and then sought to be recovered back, and shall confine my examina- to those cases, which either directly or more proximately bear on the question involved in this case, if more freight be demanded by a railroad company than it has a legal right to demand, and such unjust demand is complied with, and more freight is paid than is legally due, he can recover it back, and if so under what circumstances.

The case of *Thomas* v. *City of Richmond*, 12 Wall. 349, did not involve directly the question presented by this record; but Justice Bradley in delivering the opinion of the court on page 355 lays down certain principles, which, it seems to me, have a considerable bearing on it.    He says: "Lord Mansfield in *Smith* v. *Bromley*, 2 Doug. 696, as long ago as 1760 laid down the doctrine, which has ever since been followed, in these words: 'If the act be itself immoral or the violation of the general law of public policy, both parties are *in pari delicto ;* but when the law violated is calculated for the protection of the subject against oppression, extortion and deceit, and the defendant takes advantage of the plaintiff's condition or situation, then the plaintiff shall recover.'"    The rule thus stated would, when applied to such a case as that before us, lead to the conclusion, that if a party pays to a railroad company more freight than the company could legally demand, he could recover it back, if the railroad company in demanding the illegal amount for freight took advantage of the condition or situation of the plaintiff; for the laws fixing the maximum charges of railroad companies were expressly intended to protect persons sending freight from the extortion or oppression of railroad companies.

There has been one English case and a number of recent

American cases bearing directly on the question : Under what circumstances would the demand of a railroad company of an illegal amount for freight be regarded as a taking advantage of the situation of a party sending freight, so as to make his payment of the illegal amount of freight demanded a payment under compulsion and enable him by an action to recover of the railroad company the amount he paid in excess of the legal charge ?  The English case is *Parker* v. *The Great Western Railway Company*, 7 Man. & G. 253, decided in 1844.  In that case the plaintiff was charged by the defendant for freight certain rates which it demanded, and it refused to carry the freight for the plaintiff, unless he would pay its charges in full ; and the plaintiff to get his goods carried paid them in full protesting, that they were greater than the defendant had a right to demand.  He afterwards brought an action of *assumpsit* to recover back the money, which he had paid in excess of the legal charges, and recovered the amount.  On the question, whether the money so paid could be recovered back in this action of *assumpsit*, the court on page 292, 49 Eng. Com. Law R. says :

"It was argued by the defendant that it could not ; for the payments were made voluntarily with a full knowledge of all the circumstances, and the plaintiff was not compelled to make these payments but in each case must be considered as having made a contract with the company to pay a certain sum of money as the consideration for the carriage of his goods ; and having made such contracts he cannot now retract and recover the money paid in pursuance of them.  In support of this argument *Knibbs* v. *Hall*, 1 Esp. N. P. C. 84 ; *Brown* v. *McKinley*, 1 Esp. N. P. C. 279 ; *Bilbie* v. *Lumley*, 2 East 469, and *Brisbane* v. *Deans*, 5 Taunt. 143 were cited.  On the other side it was argued, that they could not be considered as voluntary payments ; that the parties were not on an equal footing ; that the defendant would not, till such payments were made, perform that service for the plaintiff, which he was entitled by law to receive from it without making such payments ; and that consequently he was acting under coercion ; and in support of this view of the case *Dew* v. *Parsons*, 2 B. & Ald. 562, 1 Chitt. Rep. 295 ; *Morgan* v. *Palmer*, 2 B. & C. 729, 4 D. & R. 283 ; and *Waterhouse* v. *Keen*,

4 B. & C. 200, 6 D. R. 257 were cited. We are of opinion the payments were not voluntary. They were made in order to induce the company to do that which they were bound to do without them; and for the refusal to do which an action on the case might have been maintained as expressly decided in the case of *Pichford* v. *The Grand Junction Railway Company*, 10 M. & W. 399; and in this respect the case very much resembles that of ————— v. *Pigott* mentioned by Lord Kenyon in *Cartwright* v. *Rowley*, 2 Esp. N. P. C., 723. That was an action brought to recover back money paid to the steward of a manor for producing at a trial some deeds and court-rolls, for which he had charged extravagantly. The objection was that the money had been voluntarily paid, and so could not be recovered back again; but it appearing that the party could not do without the deeds, so that the money was paid through necessity and the urgency of the case, it was held to be recoverable. We think the principle on which this decision proceeds is a sound one, and strictly applicable in the present case, and that the defendants can not by the assistance of that rule of law, on which they relied, retain the money they have improperly received."

In *Swift Company* v. *United States*, 111 U. S. 29, the court citing the above case approvingly says: "The appellant had no choice. The only alternative was to submit to an illegal exaction or discontinue its business. It was in the power of the officers of the law and could only do as they required. Money paid or other value parted with under such pressure has never been regarded as a voluntary act within the meaning of the maxim *volenti non fit injuria*. In *Close* v. *Phipps*, 7 M. & Gr. 586, which was a case of money paid in excess of what was due to prevent a threatened sale of mortgaged property, Tindal C. J. said: 'The interest of the plaintiff to prevent the sale by submitting to the demand was so great, that it may well be seen the payment was made under what the law calls a species of duress.' And in *Parker* v. *Great Western Railway Company*, 7 M. & Gr. 253, the wholesome principle was recognized, that payments made to a common carrier to induce it to do what by law without them it was bound to do, were not voluntary and might be recovered back. Illegal interest, paid as a condition to redeem a farm,

was held in *Astley* v. *Reynolds*, 2 Stra. 915, to be a payment by compulsion. This case was followed after a satisfactory review of the authorities in *Tatt* v. *Ide*, 3 Blatchf. 249; and in *Ogden* v. *Maxwell*, 3 Blatchf., it was held that illegal fees exacted by a collector though sanctioned by long continued usage and practice in the office under a mistaken construction of the statute, even when paid without protest, might be recovered back, on the ground that the payment was compulsory and not voluntary. And in *Maxwell* v. *Griswold*, 10 How. 242–256 it was said by this court : 'Now it can hardly be meant in this class of cases, that to make a payment involuntary, it should be by actual violence or any physical duress. It suffices, if the payment is caused on the one part by an illegal demand, and made on the other part reluctantly and in consequence of that illegality and without being able to regain possession of his property except by submitting to the payment.' To the same effect are *American Steamship Company* v. *Yong*, 89 Penn. St. 186 ; *Cunningham* v. *Munroe*, 15 Gray 471 ; *Carrew* v. *Rutherford*, 106 Mass. 1; *Preston* v. *Boston*, 12 Pick. 7. In *Beckwith* v. *Frisbie*, 32 Vt. 559–566 it was said : 'To make a payment voluntary, the parties should stand upon an equal footing.' If a person illegally claims a fee *colore officii*, the payment is not voluntary so as to preclude the party from recovering it back, *Morgan* v. *Palmer*, 2 B. & C. 729. In *Steel* v. *Williams*, 8 Exch. 625, Martin B. said : 'If a statute prescribes certain fees for certain services, and a party assuming to act under it insists upon having more, the payment can not be said to be voluntary. No formal protest made at the time is by statute a condition to the present right of action, or in cases of action against the collector to recover back illegal taxes exacted.' "

In the same spirit as these remarks are the views expressed by the Supreme Court of the United States in *Railroad Company* v. *Lockwood*, 17 Wall. 379, in speaking of contracts by a railroad company with customers for exemptions from responsibilities. The court say : "The carrier and his customer do not stand upon a footing of equality. The latter is only one individual of a million. He can not afford to higgle or stand out and seek redress in the courts. His business will not admit of such a course. He prefers rather to accept

any bill of lading or sign any paper the carrier presents, often indeed without knowing what one or the other contains. In most cases he has no other alternative but to do this or abandon his business."

The oldest decision in this country directly on the question under discussion which I have found, was rendered in 1871. It was the case of McGregor v. Erie Railroad Company, 35 N. J. 89. In that case the court say: "The defendants at the time of the delivery of the goods disputed a part of the charges made by the railroad company but paid them and afterwards brought an action of assumpsit to recover back the amount over-paid." On page 112 the court say: "It is undoubtedly a general rule of law, that money voluntarily paid with a full knowledge of the facts even if for an unjust claim, and even if paid under protest simply, can not be recovered back. There are many cases however to which the rule does not apply. The action for money had and received, speaking generally, lies to recover money which in equity and good conscience ought to be refunded. But this expression is too general as a guide. The ordinary cases where it is maintained are stated by Lord Mansfield in the case of Moses v. McFarland, 2 Burr. 1009 very concisely as follows: 'But it lies for money paid by mistake, or upon a consideration which happens to fail, or for money got through imposition, express or implied, or an undue advantage taken of the plaintiff's situation, contrary to laws made for the protection of persons under those circumstances.' Although the decision in Moon v. McFarland is overruled, yet this statement of the Lord Chief Justice is cited approvingly in the law. In ordinary cases between individuals, where a person has no power to enforce an unjust claim but by legal remedies, and another pays it, even under protest, he can not recover it. Both parties are on an equal footing. But where they are not on an equal footing and money is paid, not by compulsion of law, but by compulsion of the circumstances, as when it is paid to relieve goods from illegal restraint which could not otherwise be reasonably obtained, or to compel the performance by others in order to enjoy or obtain a right, then it may be recovered back. Of this latter kind are moneys paid under order of tolls or charges on turn-pikes

or railroads. *Feamley et al.* v. *Morley*, 5 B. & C. 25 ; *Parker* v. *G. W. Railroad Company*, 7 M. & G. 253 ; *Parker* v. *Bristol and Exeter Railroad Company*, 6 Exch. 702. The principle of these cases is that money was paid involuntarily in point of fact and in order to induce the parties to do what they were obliged to do without requiring the payment. It was the right of the plaintiffs to have their goods carried for the legal rates, and if it was reasonably necessary for the plaintiffs to pay the unjust demand in order to enjoy that right, and they did then pay under protest, the payment will not be considered as voluntary. In the case of *Parker* v. *The G. W. Railroad Company* the company refused in terms to carry the goods unless paid its demands. In the case of *Feamley* v. *Morley*, 5 B. & C. 25, the gate of a turnpike being closed, a coachman was prevented from proceeding, the coachman protesting but paying the toll demanded. In these cases there was an express refusal; but I do not consider it necessary that the refusal should be express. It is sufficient if the person has just and reasonable ground to apprehend that unless the money is paid his goods will not be carried or will be withheld. Where a corporation or person has the power to refuse a right, to which a party is entitled, unless he complies with an unjust demand, they do not stand upon an equal footing. The courts will not be illiberal in allowing a person to act upon his reasonable apprehension of such refusal when the circumstances fairly show that unless he does submit to the illegal demand, his right will be withheld. There are indications in the following cases to that effect in principle. *Valpy* v. *Manley*, 1 M. G. & S. 594 ; *Morgan* v. *Palmer*, 2 B. & C. 729 ; *Steel* v. *Williams*, 8 Exch. 624. I find no case directly ruling this point, but the principle seems to be this; that if in the dealing with a railroad corporation the illegal demand is of such a character, as that a person of ordinary prudence would be justified in believing, that unless he did submit to it, the carriage of his goods or their delivery when carried would be denied, and he does submit under protest, then it is not voluntary; and in most cases the facts should be left to the jury to say whether the payment under the particular circumstances was voluntarily or not.

"In the case before us the company had issued a general order

to their agents to make an additional charge. It was peremptory, without any modification, and the company have no right to say that was an experiment. The local agents had no right to receive goods at less rates or to take less in payment of carriage. The plaintiffs were doing a daily business which could not help but be injured by interruptions. Their business was done in this way: There would be at least one freight each way a day; the bill from the down freight from Paterson and the up freight from Jersey City would be paid the next day after the carriage was accomplished and the goods generally delivered. When the two first bills were presented, after the terminal was imposed, which was about the next day after the up and down freights of November 1, 1869, the plaintiffs refused to pay the terminal, and protested against it, but afterwards paid it, and protested against succeeding bills a number of times, and asked the cashier if it was necessary to have this protest in writing and he said no; then they asked him if it was necessary to protest every time, and the cashier said it was considered a protest against all the bills the plaintiffs would have to pay. The undisputed facts of the case show that the plaintiffs and the cashier considered that these sums were being paid under protest, and were disputed by the plaintiffs. There seems to be no doubt of the fact that the plaintiffs were unwilling to pay them, and did it without intending to yield their objections. Now the company having given direct orders to their agents to charge the terminals, without any discretion, and the plaintiffs being informed of the order to collect it, the conclusion would reasonably and naturally be drawn that the company intended to do what they claimed. It is not a case of an individual making an unjust demand. A great corporation like that is operated systematically and by many agents. It is the duty of subordinates to follow instructions, to carry them out, and to adopt such means as are natural and usual for their enforcement. The plaintiffs could reasonably believe that, unless the demand was complied with, their business, which was of a continuous character, requiring promptness and dispatch would be interrupted. Under the facts then of this case the payment must be regarded as under coercion and the jury were so bound to

find, except as to the two first bills claimed, of date of November 10, 1869; protest having been made after they were presented and goods delivered they may be considered as voluntarily paid. The plaintiffs are therefore entitled to a judgment on the verdict upon omitting the amount of those two bills."

The terminal charge, which alone was the subject of dispute between the plaintiff and the railroad company during the time, that they were carrying freight for the plaintiff, was a charge of five cents per hundred pounds (for terminal expenses), which the court held, that the railroad company had no right to charge. I have given the opinion of the court at length in this case, because the decision was not only in my judgment correct (except as to the two bills of date November 10, 1869), but also because the reasoning of the court, on which it based its decision, seems to me to be in general clear and satisfactory. I do not however see why upon this general reasoning the two bills of date November 10, 1869, should have been abated from the verdict. It is true, they were objected to and protested against, after the goods were delivered; but this objection and protest were made, as soon as the bills were presented, and the plaintiff it seems to me on the reasoning of the court were not bound to make any formal protest or refusal to pay the freight demanded. As it seems to me, they had just and reasonable ground to apprehend, that, unless they paid these two first bills presented after the goods were delivered, their business, which was of a continuous character requiring promptness and dispatch, would be interrupted by the railroad company's agents refusing to deliver afterwards to the plaintiffs any goods, unless the freight including these terminal charges were paid, before the goods were delivered, which would have been such a serious interruption of the plaintiff's business as to render these two past payments as well as all subsequent ones involuntary. The reasoning of the court in this case as well as its decision except in this respect has been followed in a number of cases in other States, decided since 1871, though in but one of the opinions is this case referred to.

In the *Lafayette and Indianapolis Railroad Company et als.* v. *Palison*, 41 Ind. 312, decided 1872, it was decided in a case,

which was like this New Jersey case in this particular, that the two first car-loads of goods (in this case cattle) were delivered, before the bills were presented, the shipper refused to pay them, and the railroad agent insisted, that the bills must be paid as presented, and said, that he would not deliver any future car-loads of cattle, until the freight was paid as demanded. And thereupon the plaintiff agreed with the agent, that he would pay under protest the bills presented and also future freight as demanded, but he would reserve the right to recover such sums unjustly paid. It was decided, that the payments were not voluntary, and that the plaintiff could recover all sums he paid in excess of the just demand including these first two payments made after the delivery of the cattle. The court say page 329 :

" We are of opinion, that the money so paid can be recovered back, if there had been no valid agreement that it might be. While the appellants were not in the actual possession of the cattle of this appellee, they possessed such power and control over the shipment and delivery thereof, as gave them an undue advantage over the appellee, and the necessity of the appellee was so great and pressing, as to deprive him of the freedom of his will. The unjust and wrongful demand of the appellants and the necessities of the appellees coerced him to make the payments, but he made them under protest, and accompanied them with remonstrances against the injustice of the demand upon him. In *Maxwell* v. *Griswold*, 10 How. (U. S.) 292, the importer submitted to the unjust and illegal demands made upon him by the collector to avoid a greater evil, and the court held, that he acted under moral duress, and that he could recover back the money which the law coerced and extorted from him. The parties did not stand upon equal terms. The appellee had to perform his contract with the government (to deliver it cattle), or sustain not only loss of profit, but subject himself to damages. The contract being limited to two months, he had no time to purchase other cattle, or procure shipment by a different route. The appellants refused in advance to deliver any future shipments, unless the bills of freight were paid as made out by the way-bills. There were six shipments of cattle, and if the appellee had resorted to the action of replevin he would have.

been compelled to have brought six separate suits. To require this would have been unreasonable and oppressive. It is well settled by an unbroken current of authorities in England and in this country, that money can be recovered back which has been procured through imposition, extortion, or oppression, or when an undue and unconscionable advantage has been taken of the situation or great and pressing necessity of a person who by means thereof, has been coerced into the payment, which gives such payment the character of a compulsory payment."

The opinion of the court in this case is an able one; and I fully concur in its general reasoning as well as in the conclusion reached.

It seems to me, that the express refusal of the railroad company's agent to deliver cattle subsequently shipped, unless the party paid or agreed to pay the freight demanded, was not at all necessary to enable the plaintiff in that case to recover, as it seems to me that it is a reasonable and almost necessary conclusion, that the agent of a railroad company would not deliver freight, unless the shipper would pay the regular charges, which in such case the railroad company fixed whether such charges were lawful or illegal.

In the *Chicago and Alton Railroad Company* v. *The Chicago, Vermillion and Wilmington Coal Company*, 79 Ill. 121, (decided in 1875), it was held: "As the coal company had no other outlet for its coal, and the railroad company exacted more freight than it was entitled to, the coal company should be considered as under a kind of moral duress, and the payment by them of freight demanded under such circumstances cannot be considered voluntary, and they have a right to recover back the excess of freight paid over what was due." In that case, no protest or refusal to pay the freights demanded appears,. yet the court say on page 130 : "It can hardly be said these enhanced charges were voluntarily paid by appellees. It was a case of 'life and death' with them as they had no other means of conveying their coals to the market offered by the Illinois Central and they were bound to accede to any terms the appellants might enforce. They were under a sort of moral duress, by submitting to which appellants have received money from them, which in equity and good conscience they ought not to

retain. *Ripley* v. *Gibson*, 9 Johns. 201; *Taylor* v. *Taylor*, 20 Ill. 650; *Watson* v. *Woolverton*, 41 Ill. 241."

In *Mobile and Montgomery Railway Company* v. *Steiner, McGehee & Co.*, 61 Ala. 560, (decided in 1878,) it was held: " The nature of the business considered, the shipper does not stand on equal terms with the carrier in contracting for charges for transportation ; and if the shipper pays the rates established in violation of law by the carrier rather than forego his services, such payment is not voluntary in the legal sense, and the shipper may maintain his action for money had and received to recover back the illegal charge." In this case, page 566, the evidence showed, that the defendants refused to allow the plaintiffs to have their cotton taken from the defendant's ware-houses, until certain exhorbitant and illegal rates were paid or agreed to be paid, and without such understanding the defendants would have prevented the plaintiffs from removing the cotton from their ware-houses, as in some instances they did, without prepayment of charges. Plaintiffs made general complaint to the superintendent of the defendants of the exorbitance of their charges. On page 595 the court say : " Railroads have so expedited and cheapened travel and transportation ; have so driven from their domain all competing modes of transportation, that the public is left no discretion but to employ them or suffer irreparable injury in this age of steam and electricity. They have their established rates of charges and these the shipper must pay or forego their facilities and benefits. To object or protest would be idle waste of words. The law looks to the substance of things and does not require useless forms and ceremonies. The corporation and shipper are in no sense on equal terms, and money thus paid to obtain a necessary service is not voluntarily paid, as the law interprets the phrase."

In the case of the *Chicago and Alton Railroad Company* v. *The C., V. & W. Coal Co.*, 79 Ill. 121, the court in reply to the objection that the money was voluntarily paid, said : " It can hardly be said the enhanced charges were voluntarily paid by the appellees. It was a case of life and death with them, as they had no other means of conveying their coals by the Illinois Central and were bound to accede to any terms the appellants might impose. They were under a sort of moral

duress, by submitting to which appellants have recovered money from them which in equity and good conscience they ought not to retain."

The case of *Parker* v. *The Great Western Railroad Company*, 7 Man. & Gr. 253 was a suit by a shipper to recover back excessive charges paid the railroad. It was objected the payments were voluntary. They were made in order to induce the company to do that which they were bound to do without them; and for the refusal to do which an action on the case might have been maintained. The case was *assumpsit* for money had and received, and the court ruled the action was well brought.

To the same effect are the following authorities: 2 Greenlf. Ev. § 121; *Caldwell* v. *Pedin*, 3 Watts 327; *Harmony* v. *Brigham*, 2 Kerr. 99; *Boston and S. Company* v. *City of Boston*, 4 Metc. 181; *Chandler* v. *Sanger*, 144 Miss. 364; *Stephens* v. *Daniels*, 27 Ohio St. 527; *Tuttle* v. *Everett*, 51 Miss. 27; *Howe* v. *State*, 53 Miss. 57; *Robinson* v. *Ezzell*, 72 N. C. 231; *First National Bank* v. *Watkins*, 21 Mich. 483; *Atwell* v. *Zeluff*, 26 Mich. 118; *McKee* v. *Campbell*, 27 Mich. 497; *Curew* v. *Rutherford*, 106 Mass. 1; *L. & J. Railroad Company* v. *Pattison*, 41 Ind. 311

The case of *Potomac Coal Company* v. *C. & P. Railroad Company*, 38 Md. 226, is not in harmony with the above; but we decline to follow it.

Most of the above cases cited to sustain the position of the court were cases of suits brought to recover back illegal taxes, which had been paid; and, as we have said, this class of cases are entitled to comparatively little weight in determining the question under consideration. It will be observed, that the two cases last cited from Alabama and Illinois of suits brought to recover back money paid to railroad companies in excess of legal rates have gone a good deal further than previous cases had gone in holding that such monies may be recovered back, the payment not being regarded as voluntary. But it seems to me, that they have not laid down the law any too strongly; and that neither objection nor protest by the shipper, when illegal freight charges are demanded by a railroad company, ought to be required, in order to entitle the shipper to recover, nor should the fact, that the freight had

been delivered, when the payment was made, necessarily prevent such recovery. It would under some circumstances have that effect, as when the shipper was not one engaged in a business in which it was necessary to make frequent and habitual use of the railroad, or where the shipper had other convenient modes of transporting his goods, so that the railroad company had no undue advantage of him. But when the shipper was one whose business could not be successfully carried on without frequent use of this identical railroad for transportation purposes, then, it seems to me, in making over payments for freight on the demand of the railroad company he should be regarded as making them under a species of moral duress, and such payments should be regarded as involuntary, and he should in an action of *assumpsit* for money had and received be allowed to recover back of the railroad company what he had paid in excess of legal charges; and this position is sustained by these most recent cases.

The most recent case, which I have seen, of an action of this description against a railroad company is *Peters* v. *Marietta & Cincinnati Railroad Company*, 42 Ohio St. This is one of twelve cases, each of which involves similar facts and questions of law. One question involved in this case was, whether the plaintiff could recover back of the defendant illegal freights which he had paid. The facts, as shown by the evidence, in reference to these payments were, that the plaintiff paid the charges for each month at the end of the month. Judge Follet, who delivered the opinion of the court, thought from the evidence, that these payments were made to secure transportation for the succeeding month, and the plaintiffs in each of the cases were doing a manufacturing business, and if they could not get such transportation, their business would have greatly suffered. But Judge McIlvain, who dissented, thought that there was no testimony satisfactorily showing, that payments were exacted as a condition of future freightage or paid on any reasonable belief, that future freight would be refused, unless payments were made. I would say with reference to this diversity of opinion, that it seems to me, that the presumption would always be, that a railroad company would continue to charge its fixed rates, whether a shipper protested or not, and that, if any shipper refused to

pay the rates demanded, the railroad company would refuse to transport his goods. And if the railroad would establish, that payments of exhorbitant rates for freight paid by one whose business required frequent transportation of such goods over the same railroad, were voluntarily paid without any reasonable belief, that future freight would be refused, unless the rates of payment paid by the company, and by it demanded was paid, the burden of proving this would be on the railroad company, and that payments of freights demanded of a regular shipper of freight over a railroad, when he had no other convenient way of transportation, should in the absence of proof to the contrary be regarded as made on a reasonable belief, that future freight would be refused, unless the payments demanded were made by the shipper.

In that case the decision of the court was that the illegal freight paid to the railroad company could be recovered back. In that case all the similar cases, which I have cited and commented on, were cited by the court and the court say : " The plaintiffs could compel the defendants to carry their freight only by a resort to the court and at the end of litigation. The history of these suits, begun in 1867 and just ended in 1884, shows that the plaintiffs could not obtain speedy and adequate redress—such as would save their business and prevent loss—simply by a resort to the courts to enforce legal rights. And as the defendant would not accept the payment of legal rates, and required the full payment of its illegal charges, the plaintiffs complaining and objecting to the increased and illegal charges were forced to pay them. Their choice and volition were compelled—such payments are not voluntary."

Against these numerous authorities I have found but a single case, where a railroad company was not compelled to pay back illegal freight, which on its demand had been paid by a shipper, that is, *The Potomac Coal Company* v. *The Cumberland and Pennsylvania Railroad Company*, 38 Md. 226. This case was decided in 1873 and before the decision of most of the cases to which I have referred. None of these similar railroad cases either in England or America were referred to in that case by the court, though the English case was referred to by counsel in argument. The only cases referred to by the

court in its opinion were three Maryland cases, two of which were cases of taxes paid, which were illegal, and which the court had decided could not be recovered because paid under a mistake of law; and the third a case where the city authorities had ordered a resident to build a certain wall, and if he failed to do it, declared they would build it and charge the costs to him.   He then built and brought suit to recover of the city the money which he had expended, the city authorities having no power to require him to build the wall.   In that case *Mayor and City Council of Baltimore* v. *Lefferman*, 4 Gill 436, the court on page 436, say:

"We consider the doctrine as established that a payment is not to be regarded as compulsory, unless made to emancipate the person or property from an actual or existing duress, imposed upon it by the party to whom the money is paid."

This case was, I think, correctly decided; but it is apparent from many of the authorities, which I have cited, that the law is not correctly laid down in the above quotation.   And yet it was in the two subsequent tax-cases referred to by the court as well as in the railroad case of the *Potomac Coal Company* v. *Pennsylvania Railroad Company*, treated as correct and as finally settled as the law of Maryland.   The facts are not stated in this last case.   All that is said appears on page 230: "It appears from the agreed statement of facts that the appellee was carrying coal for the appellant for nearly seven years, during the whole of which time the latter was voluntarily paying the freights demanded."

The suit was brought to recover the excess of freights paid during this time over what was deemed to be the legal rates, which could be charged.   Of course if they were, as stated by the court, voluntarily paid, they could not be recovered back.   In the absence of the agreed facts it is of course impossible for me to say, whether the conclusion reached was or was not correct; for from the erroneous manner, as I conceive, in which the court defined what was regarded as compulsory payment, as above stated, it is obvious, they may have regarded the facts agreed as showing the payments were voluntary, while, if I knew the facts, I might regard them as not voluntary but as compulsory.

There is one other question presented by the record in this case, that is: Was it necessary for the defendant to make a demand for a repayment to him of the excess, which he had paid to the plaintiff beyond its legal charges before the institution of this suit? All the cases we have referred to show, that the proper form of action to recover back money, which has been paid on an illegal and unjust demand, is *assumpsit* for money had and received for the plaintiff's use. This raises an implied promise to pay upon demand, and as a matter of mere form the court closes with a *sæpe requesitus*, but no proof of demand is necessary to support the averment. One is under no more obligation to prove a demand, before he can recover on the implied promise, when money is had and received for the plaintiff's use, than he would be to prove a demand, where the promise was an express one to pay on demand; as, for instance, a note payable on demand. These positions are so elementary, that I need refer to no authority to sustain them; but I will refer to 3 Rob. Practice p. 602, where this is stated to be the law as universally admitted.

It only remains to apply the law as we have stated it to the present case; but before so doing I would say, I attach no importance to the fact, that it was proven that the defendant agreed to pay the whole of plaintiff's demand, if the plaintiff would abate $3.00 or $4.00 which defendant disputed; for this occurred after all the over-payments had been made by the defendant; and it did not therefore influence the conduct of either party while these over-payments were being made. It was a proposition of compromise in which the defendant proposed to surrender substantial rights; but the proposition was not accepted, and therefore the parties were left to their equal rights, as if no such proposition had been made.

The instruction set out in the second bill of exceptions was obviously not prejudicial to the plaintiff. It amounted simply to telling the jury, that the West Virginia Transportation Company was despite its charter bound by the Act of March 3, 1875, which enacted, "that any incorporated company operating by steam or horse-power a railroad not exceeding thirty miles in length may charge for the trans-

portation of freight not exceeding twenty cents per ton per mile." This, as we have seen, was expressly decided by this Court in the *Laurel Fork and Sand Hill Railroad Company* v. *The West Virginia Transportation Company, supra.* It is also obvious from what has been said, that the court properly modified the instruction contained in bill of exceptions No. 3, and that without such modification the instruction would have been erroneous. The modification may not be very aptly expressed, but it is obvious that the instruction with the modification was not prejudicial to the plaintiff, and in my judgment, as it was doubtless understood by the jury, it laid down the law correctly. It is obvious from what we have stated, that the court did not err in rejecting the plaintiff's motion to exclude from the jury all the evidence adduced by the defendant, so far as the same proved or tended to prove the defendant's account of set-off because of any one of the three grounds set out in the plaintiff's bill of exceptions No. 1; and lastly, the court did not err in refusing to grant the plaintiff a new trial, the evidence certified in bill of exceptions No. 1 justifying the verdict found by the jury.

The judgment of the circuit court of October 10, 1879, must therefore be affirmed; and the defendant in error must recover of the plaintiff in error his costs in this Court expended and damages according to law.

AFFIRMED.